Alexander K. Obrecht (Wyoming Bar No. 7-5542)
L. Poe Leggette (Wyoming Bar No. 7-4652)
Mark S. Barron
BAKER & HOSTETLER LLP
1801 California Street, Suite 4400
Denver, Colorado 80202
Telephone: 303.861.0600
Facsimile: 303.861.7805
pleggette@bakerlaw.com
aobrecht@bakerlaw.com
mbarron@bakerlaw.com

*Attorneys for Petitioners*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| WESTERN ENERGY ALLIANCE, INDEPENDENT PETROLEUM ASSOCIATION OF NEW MEXICO, NEW MEXICO OIL & GAS ASSOCIATION, NORTH DAKOTA PETROLEUM COUNCIL, PETROLEUM ASSOCIATION OF WYOMING, AND UTAH PETROLEUM ASSOCIATION,<br><br>Petitioners,<br><br>v.<br><br>DEB HAALAND, in her official capacity as Secretary of the Interior, and UNITED STATES BUREAU OF LAND MANAGEMENT,<br><br>Respondents. | Civil Case No. _____ |

## PETITION FOR REVIEW OF FINAL AGENCY ACTION

Petitioners—Western Energy Alliance, Independent Petroleum Association of New

Mexico, New Mexico Oil and Gas Association, North Dakota Petroleum Council, Petroleum

Association of Wyoming, and Utah Petroleum Association (collectively the "Associations")—

respectfully submit this petition for review of government action under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), and Local Civil Rule 83.6.

On April 12, 2024, the Bureau of Land Management ("BLM") issued a final rule titled: Fluid Mineral Leases and Leasing Process.[1] On April 23, 2024, BLM published the rule in the *Federal Register*. *See* Fluid Mineral Leases and Leasing Process, 89 Fed. Reg. 30,916 (Apr. 23, 2024) (the "Leasing Rule"). The Leasing Rule represents a sea change to BLM's oil and gas leasing program. While BLM contends the Leasing Rule will improve "the leasing process by ensuring proper stewardship of public lands and resources," the Rule's impact will be to deter development of federal oil and gas, disproportionately affect small companies, effectively close eligible and available lands to new leasing, and violate BLM's duty to promote oil and gas development as a multiple use of federal lands. At its heart, the final rule is procedurally deficient, arbitrary and capricious, and contrary to law. The Court should invalidate and vacate the Leasing Rule.

## PARTIES

1.      Western Energy Alliance ("Alliance") is the leader and champion for independent oil and natural gas companies in the West, including Wyoming. Working with a vibrant membership base for over 50 years, the Alliance stands as a credible leader, advocate, and champion of industry. Our expert staff, active committees, and committed board members form a collaborative and welcoming community of professionals dedicated to abundant, affordable energy, and a high quality of life for all. Alliance members are independent oil and natural gas producers, the majority of which are small businesses with an average of fourteen employees. The Alliance advocates for its members' interests related to federal legislative, regulatory,

---

[1] Press Release, Bureau of Land Mgmt., BLM Ensures Fair Taxpayer Return, Strengthens Accountability for Oil and Gas Operations on Public Lands (Apr. 12, 2024), *available at* https://www.blm.gov/press-release/blm-ensures-fair-taxpayer-return-strengthens-accountability-oil-and-gas-operations.

environmental, and public lands policy issues. The Alliance often appears before Congress and federal agencies and in the judicial system to represent its members.

2.     The Petroleum Association of Wyoming ("PAW") represents companies involved in all aspects of responsible oil and gas development in Wyoming, including oil and gas production, midstream processing, pipeline transportation, oilfield service, and essential work such as legal services, accounting, consulting, and more. PAW advocates for oil and gas development that supports sustainable production of Wyoming's abundant resources; fosters mutually beneficial relationships with Wyoming's landowners, businesses, and communities; and upholds the values of science-based, environmental stewardship. PAW members regularly participate in federal land planning processes including the development of resource management plans and reviews conducted under the National Environmental Policy Act ("NEPA"). PAW members support, service, and assist in the development of oil and gas resources on federal leases.

3.     Established in 1952, the North Dakota Petroleum Council ("NDPC") is the trade association and primary voice for the oil and gas industry in North Dakota. NDPC represents more than 530 companies involved in all aspects of the oil and gas industry, including oil and gas production, refining, pipeline development and operation, transportation, mineral leasing, consulting, legal work, and oil field service activities in North Dakota, South Dakota, and the Rocky Mountain Region. The mission of NDPC is to promote opportunities for open discussion, lawful interchange of information, and education concerning the petroleum industry; to monitor and influence legislative and regulatory activities on the state and national level; and to accumulate and disseminate information concerning the petroleum industry to foster the best interests of the public and industry.

4.    The Utah Petroleum Association ("UPA") is a statewide oil and gas trade association established in 1958, representing companies involved in all aspects of Utah's oil and gas industry. UPA members range from independent producers to midstream and service providers, and to major oil and natural gas companies widely recognized as industry leaders responsible for driving technology advancement resulting in environmental and efficiency gains.

5.    Formed in 1978, the Independent Petroleum Association of New Mexico ("IPANM") advances and preserves the interests of independent oil and gas producers across New Mexico while educating the public to the importance of oil and gas to the state. The Independent Petroleum Association of America defines an "independent" company as a producer who has less than $5 million in retail sales of oil and gas in a year. Independent producers develop 91% of the wells in the United States—producing 83% of America's oil and 90% of America's natural gas. IPANM actively works to promote legislation and regulations, engages with state and federal regulatory agencies that oversee the oil and gas industry, and pursues litigation when necessary. It also provides technical education to members on matters of interest, including on regulatory compliance matters. IPANM has over 350 members, working in all aspects of the oil and gas industry.

6.    The New Mexico Oil & Gas Association ("NMOGA") is a coalition of oil and natural gas companies, individuals, and stakeholders dedicated to promoting the safe and environmentally responsible development of oil and natural gas resources in New Mexico. Representing over 200 member companies, NMOGA works with elected officials, community leaders, industry experts, and the general public to advocate for responsible oil and natural gas policies and increase public understanding of industry operations and contributions to the state.

4886-6456-1596.6

7.      Association members: (1) hold, develop, and produce oil and gas from federal leases; (2) are bonded through BLM's bonding process; (3) pay the fees established by BLM for various filings; and (4) regularly nominate federal parcels for auction, participate in federal oil and gas lease sales, and acquire federal parcels through BLM's sales and intend to do so in the future. The Leasing Rule will impair all these interests.

8.      Respondent Deb Haaland is the Secretary of the United States Department of the Interior. Secretary Haaland is a cabinet-level officer of the United States government and named herein in her official capacity.

9.      Respondent BLM is a bureau within the United States Department of the Interior. BLM is the custodian of the federal mineral estate and is responsible for the administration and management of oil and gas development on federal lands.

## SUBJECT MATTER JURISDICTION

10.     This Court has federal-question jurisdiction under 28 U.S.C. § 1331.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(e) as BLM maintains offices and conducts official duties in Wyoming, Wyoming contains the most acreage of federal oil and gas leaseholds in the United States that will be impacted by the Leasing Rule, and PAW is an entity incorporated under Wyoming law with its principal place of business in Casper, Wyoming. Furthermore, many members of the Alliance and PAW operate in and are residents of Wyoming whose livelihoods depend on rational and lawful regulation of the development of federal oil and gas.

12.     The United States has waived its sovereign immunity under the APA, 5 U.S.C. § 702.

**FACTUAL ALLEGATIONS RELATING TO THE GROUNDS ON WHICH THE
AGENCY ACTION IS BEING CHALLENGED**

*BLM's Management of Federal Oil and Gas and Impact on Wyoming*

13.    The United States owns more than 700 million subsurface acres of mineral estate. The Mineral Leasing Act ("MLA") establishes the framework under which the Secretary of the Interior leases and manages the development of these resources. The Secretary has delegated her statutory responsibilities associated with the administration of the oil and gas leasing program to BLM.

14.    BLM administers the minerals found beneath: (i) the 258 million surface acres that BLM manages; (ii) 57 million surface acres where the minerals are federally owned but the surface is in non-federal (mostly private) ownership; and (iii) another 385 million acres on which federal agencies other than BLM manage the surface. BLM estimates that half of these 700 million subsurface acres contain oil and/or natural gas.

15.    In 2008, BLM determined that these lands contain an estimated 31 billion barrels of technically recoverable oil and 231 trillion cubic feet of technically recoverable natural gas. Since that time, technological innovations such as horizontal and directional drilling, in combination with hydraulic fracturing, have made previously uneconomic or unrecoverable reserves available. These technologies have opened a new supply of undeveloped oil and natural gas on BLM lands above and beyond the already substantial numbers identified in the 2008 study.

16.    As of the end of FY 2023, approximately 23 million mineral acres—roughly 3.3% of the federal mineral estate—were leased for oil and gas development. Of that amount, BLM characterizes only 12.4 million mineral acres—less than 2% of the federal mineral estate—as being in producing status. Yet in FY 2023, the onshore federal oil and gas program generated

- 6 -

$8.5 billion in the form of royalties, rents, bonuses, and other fees on federal and Indian leases. The amount of annual revenue that federal mineral development provides the U.S. Treasury is second only to that provided by the Internal Revenue Service.

17.     Specific to the BLM Wyoming State Office and related district and field offices, BLM manages more than 42 million acres of fluid mineral estate and more than 7.5 million acres of federal oil and gas leases, the largest area of any state in the nation. In FY 2023, the federal oil and gas program in Wyoming generated over $1.2 billion in royalties, bonus, rents, and other revenues.

18.     Approximately half of all federal oil and gas royalty, rental fee, and bonus bid revenue is paid to the State in which the development occurred. In FY 2022, the State of Wyoming received more than $785 million in disbursements from federal oil gas revenues.

*The Leasing Rule*

19.     On July 23, 2023, BLM published the proposed Leasing Rule, proposed categorical exclusion from NEPA, and economic analysis.

20.     After public comment—including from the Associations—on April 23, 2024, BLM published the final Leasing Rule, signed categorical exclusion, and final economic analysis.

21.     The Leasing Rule spans fifty pages in the *Federal Register* and represents a dramatic change to the BLM's oil and gas leasing process. Among other regulatory changes, the Leasing Rule:

> a.   Increases the required bond per lease from $10,000 to $150,000;
>
> b.   Increases the required statewide bond from $25,000 to $500,000;
>
> c.   Eliminates the option for nationwide and unit operator bonds;

d.  Increases the royalty rate from 12.5% to 16.67% for all leases issued on or after August 16, 2022;

e.  Increases the minimum per acre bid to $10 per acre;

f.  Increases the rental rate to $3 per acre per year for the first two years, $5 per acre per year for the third to eighth year, and $15 per acre for every subsequent year;

g.  Creates a $5 per acre fee for an expression of interest due upon submission of the expression of interest;

h.  Creates or increases fees, which BLM will automatically increase for inflation, for various filings related to oil and gas development;

i.  Codifies preference criteria for evaluating an expression of interest, including: (1) proximity to oil and gas development existing at the time of BLM's evaluation; (2) the presence of fish and wildlife habitats or connectivity areas; (3) the presence of historic properties, sacred sites, and other high value cultural resources; (4) the presence of recreation and other important uses or resources; and (5) the potential for oil and gas development; and

j.  Extends the term for applications for permit to drill from two to three years but limits the opportunity for term extensions.

22.   BLM failed to adequately respond to public comment, particularly from the regulated industry, when issuing the Leasing Rule.

23.   BLM erred by electing not to perform NEPA analysis for the Leasing Rule as the Rule is more than merely administrative, financial, legal, technical, or procedural in nature and

the environmental effects are not too broad, speculative, or conjectural to lend themselves to meaningful analysis.

24.    BLM's economic analysis failed to adequately analyze important aspects of the impacts of the Leasing Rule.

25.    BLM employed arbitrary and capricious reasoning to justify the promulgation of the Leasing Rule. As just one example, as of November 2022, the Department of the Interior admitted to the United States Senate Committee on Energy and Natural Resources that the Department estimates that only 37 orphaned oil and gas wells exist on BLM-managed lands. Yet, the Leasing Rule increases the required bonding by a magnitude of 15-to-20 times the amount previously required.

26.    The Leasing Rule includes provisions for which BLM has no statutory authority to implement.

## COUNT I

### THE LEASING RULE IS CONTRARY TO LAW
### (5 U.S.C. § 706)

27.    The Associations reassert and incorporate by reference the preceding paragraphs.

28.    Since 1920, the MLA has authorized the Secretary of the Interior "to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter." 30 U.S.C. § 189. Congress' purpose in enacting the MLA was "[t]o promote the mining of coal, phosphate, oil, oil shale, and sodium on the public domain." Act of Feb. 25, 1920, ch. 85, § 32, 41 Stat. 437.

29.    Congress has determined that it is "in the national interest to foster and encourage private enterprise in," among other endeavors, "the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure

- 9 -

satisfaction of industrial, security and environmental needs." Mining & Minerals Policy Act of 1970, 30 U.S.C. § 21a. Congress has instructed that "[i]t shall be the responsibility of the Secretary of the Interior to carry out this policy when exercising [her] authority under such programs as may be authorized by law." *Id.*

30.     The Federal Land Policy and Management Act ("FLPMA") obligates BLM to "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). To meet this obligation, BLM must consider "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources." 43 U.S.C. § 1702(c). The result of this statutory scheme is that, while BLM has a responsibility to "prevent unnecessary or undue degradation of the [public] lands," 43 U.S.C. § 1732(b), accounting for the productivity of the federal mineral estate is a statutory imperative.

31.     Because "FLPMA prohibits only unnecessary or undue degradation, not *all* degradation," BLM must ensure that regulatory measures do not prevent the extraction of federal minerals. *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 78 (D.C. Cir. 2011) (holding setbacks that protected sage-grouse but which prevented natural gas extraction did not satisfy BLM's obligation to balance development with conservation). The Interior Board of Land Appeals has interpreted "unnecessary or undue degradation" to mean the occurrence of "'something more than the usual effects anticipated' from appropriately mitigated development." *Id.* at 76 (quoting *Biodiversity Conservation Alliance*, 174 IBLA 1, 5-6 (2008)). More than speculation is required: "Without evidence that future injury will occur, it cannot be argued that degradation of the lands will occur, . . . or that the future degradation is unnecessary

or undue." *Wyo. Outdoor Council*, 171 IBLA 108, 121-22 (2007) (internal quotations marks omitted).

32.     Congress has also directed that access to federal lands for energy development must be efficient. BLM is required "[t]o ensure timely action on oil and gas leases and applications for permits to drill" and to effect policy that: (i) "ensure[s] expeditious compliance" with NEPA and any other applicable environmental and cultural resources laws; (ii) "improve[s] consultation and coordination with the States and the public"; and (iii) "improve[s] the collection, storage, and retrieval of information relating to the oil and gas leasing activities." Energy Policy Act of 2005, 42 U.S.C. § 15921(a)(1)(A)-(C).

33.     Rather than carry out or facilitate the accomplishment of the MLA's purposes, the Leasing Rule impermissibly frustrates those purposes. The Secretary lacks authority to implement regulations under the MLA that do not, among other features, promote the development of oil and gas on the public domain.

34.     The Leasing Rule is inconsistent with BLM's statutory responsibility to ensure that the development of domestic mineral resources is efficient, expedient, and economic.

35.     The Leasing Rule violates BLM's statutory duty to account for the public's long-term need for non-renewable resources and ensure the productivity of the federal mineral estate.

## COUNT II

### THE LEASING RULE IS ARBITRARY AND CAPRICIOUS
### (5 U.S.C. § 706)

36.     The Associations reassert and incorporate by reference the preceding paragraphs.

37.     The APA provides persons suffering a legal wrong because of agency action a right to injunctive and declaratory relief. The Court must set aside agency action unless it is supported by substantial evidence in the administrative record.

- 11 -

38.     Agency action must be based on a consideration of the relevant factors. When an agency exercises discretion, it is axiomatic that the agency must cogently explain why it has exercised its discretion in a given manner. The agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and  the choice made.  A court will not uphold agency reasoning when it constitutes little more than pretext to support an outcome selected before the agency begins consideration of the issue.

39.     BLM has not substantiated the existence of a problem the Leasing Rule is meant to address, identified the gap in existing regulations the Leasing Rule will fill, or described the objectives the Leasing Rule will achieve.

40.     BLM failed to engage with, account for, or respond to innumerable substantive comments to the draft Leasing Rule that the Associations and other similarly situated parties submitted. These omissions exacerbate BLM's failure to establish a rational connection between the regulation the Leasing Rule seeks to impose and the purposes the Leasing Rule seeks to achieve.

41.     BLM's methodology relies on alleged qualitative values associated with limiting oil and gas production without accounting for the benefits of the same production. The Leasing Rule's regulatory preamble contains no insight into the economic, actuarial, and societal benefits of the lives and lifestyles that are made possible through the consumption of oil and gas and the use of petroleum-based products.

42.     The inherent subjectivity in BLM's process undermines any explanation of the reasons the Leasing Rule has been adopted or the net benefits the Leasing Rule could bestow.

## COUNT III

**BLM FAILED TO CONDUCT REQUIRED NEPA REVIEW**
**(5 U.S.C. § 706)**

43.     Associations reassert and incorporate by reference the preceding paragraphs.

44.     The adoption of official policy, such as rules, regulations, and interpretations under the APA constitute "major federal action" that triggers a federal agency's responsibility to conduct NEPA review.

45.     The Leasing Rule will restrict, if not eliminate, oil and gas development on millions of acres of federal mineral estate that are presently open to oil and gas leasing under BLM's applicable resource management plans. The result is tantamount to an amendment to the controlling resource management plans. But "[a]mendments to [a resource management plan] . . . require environmental analysis under NEPA." *Nat. Res. Def. Council v. McCarthy*, 993 F.3d 1243, 1246 (10th Cir. 2021).

46.     The Leasing Rule constitutes a meaningful adjustment to the status quo with environmental and socioeconomic impacts that requires NEPA analysis. Restricting oil and gas development on federal lands does nothing to reduce demand for or consumption of oil and gas products. Yet BLM has not taken a hard look (or any look) at the environmental impact of shifting production from federal lands to non-federal domestic and foreign sources, where environmental standards may be less stringent and production less sustainable. *See WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1226 (10th Cir. 2017) (observing that agencies must analyze, among other categories, "reasonably foreseeable indirect effects").

47.     BLM has not examined the environmental justice impacts of shifting production from often rural and remote federal public lands to population-adjacent locations where privately owned minerals predominate. *See Sierra Club v. Fed. Energy Regul. Comm'n*, 867 F.3d 1357,

1368 (D.C. Cir. 2017) (observing that NEPA requires an agency take a "hard look" at environmental justice issues).

48.     Perhaps most glaring, BLM has not conducted any examination of how reducing oil and gas development on federal lands will affect federal lands themselves. Revenues from oil and gas development on federal leases is the primary source of funding for conservation on federal lands. Under the Great American Outdoors Act, Pub. L. 116-152, 134 Stat. 682 (Aug. 4, 2020), 50% of all energy development revenue payable to the United States, up to $1.9 billion annually, are to be deposited into the National Parks and Public Legacy Restoration Fund. *See* 54 U.S.C. § 200402(b)(1). This money is to be used "for priority deferred maintenance projects in the [National Park] System, in the National Wildlife Refuge System, on public land administered by the [BLM], for the Bureau of Indian Education schools, and in the National Forest System." *Id.* § 200402(e)(1). Because this provision is effective only through the close of fiscal year 2025, *see id.* § 200402(b)(1), leasing policies that diminish the federal government's ability to maximize this revenue stream in the near term directly undermine the federal government's ability to protect, restore, and enhance these public assets.

49.     Like all federal agencies, BLM was required, "to the fullest extent possible," to comply with NEPA when taking "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). Restricting and/or reducing oil and gas development by failing to conduct statutorily required lease sales "will certainly have a demonstrable impact on the physical environment – the world around us, so to speak – and is the very action upon which Congress intended NEPA to apply." *Idaho ex rel. Kempthorne v. U.S. Forest Serv.*, 142 F. Supp. 2d 1248, 1259 (D. Idaho 2001) (citing *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983)).

4886-6456-1596.6

50.     Because BLM had a statutory obligation to complete NEPA analyses before issuing the Leasing Rule and failed to meet that obligation, the Leasing Rule is procedurally defective and must be vacated.

## **PRAYER FOR RELIEF**

The Associations respectfully request that the Court grant the following relief:

1.     Declare that BLM's Leasing Rule, in total or in part, is contrary to law;

2.     Declare that BLM's Leasing Rule, in total or in part, is arbitrary and capricious;

3.     Vacate the BLM's Leasing Rule, in total or in part;

4.     Award all costs and attorneys' fees available under 28 U.S.C. § 2412 and other applicable law; and

5.     Such other further relief, in law and in equity, to which the Associations may be entitled.

Respectfully submitted this 15th day of May, 2024,

*/s/ Alexander K. Obrecht*
Alexander K. Obrecht
L. Poe Leggette
Mark S. Barron
BAKER & HOSTETLER LLP
1801 California Street, Suite 4400
Denver, Colorado 80202
Telephone: 303.861.0600
Facsimile: 303.861.7805
aobrecht@bakerlaw.com
pleggette@bakerlaw.com
mbarron@bakerlaw.com

*Attorneys for Petitioners*