Alexander K. Obrecht (Wyoming Bar No. 7-5542)
Mark S. Barron (*pro hac vice*)
BAKER & HOSTETLER LLP
1801 California Street, Suite 4400
Denver, Colorado 80202
Telephone: 303.861.0600
Facsimile: 303.861.7805
aobrecht@bakerlaw.com
mbarron@bakerlaw.com

L. Poe Leggette (Wyoming Bar No. 7-4652)
Bailey A. Bridges (*pro hac vice*)
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, Texas 77002
Telephone: 303.861.0600
Facsimile: 303.861.7805
pleggette@bakerlaw.com
bbridges@bakerlaw.com

*Attorneys for Petitioners*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| WESTERN ENERGY ALLIANCE, INDEPENDENT PETROLEUM ASSOCIATION OF NEW MEXICO, NEW MEXICO OIL & GAS ASSOCIATION, NORTH DAKOTA PETROLEUM COUNCIL, PETROLEUM ASSOCIATION OF WYOMING, AND UTAH PETROLEUM ASSOCIATION, <br><br> Petitioners, <br><br> v. <br><br> DEB HAALAND, in her official capacity as Secretary of the Interior, and UNITED STATES BUREAU OF LAND MANAGEMENT, <br><br> Respondents. | Civil Case No. 1:24-cv-00100-KHR |

## PETITIONERS' OPENING MEMORANDUM ON THE MERITS

**TABLE OF CONTENTS**

I.    RELEVANT BACKGROUND. ..........................................................................2

      A.    FEDERAL OIL AND NATURAL GAS LEASING PROCESS..........4

      B.    THE LEASING RULE.............................................................9

II.   STANDARD OF REVIEW...............................................................11

III.  PETITIONERS HAVE STANDING. ...............................................13

IV.   THE LEASING RULE VIOLATES THE MINERAL LEASING ACT'S
      CORE DIRECTIVE. .......................................................................17

V.    THE LEASING RULE'S INCREASE IN MINIMUM BONDING AMOUNTS
      VIOLATES THE APA. ....................................................................25

      A.    BLM's Misplaced Focus on Orphaned Wells Targets a Supposed
            Problem That Largely Does Not Exist. ................................26

      B.    BLM Disregarded Significant Impacts to Small Business.................29

      C.    BLM Bonding Assumptions Are Inaccurate......................................36

VI.   BLM FAILED TO CONDUCT REQUIRED NEPA ANALYSIS...................39

      A.    BLM's EOI Preference Criteria Constitutes an Amendment to all
            RMPs with Lands Open for Oil and Natural Gas Leasing.................41

      B.    BLM Inappropriately Relied on a Categorical Exclusion...................46

VII.  CONCLUSION................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
　72 F.4th 1324 (D.C. Cir. 2023) ..................................................31, 32, 33, 34, 35

*Bloomberg L.P. v. Sec. & Exch. Comm'n*,
　45 F.4th 462 (D.C. Cir. 2022) .................................................................35

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
　419 U.S. 281 (1974) .................................................................................12

*Brady Campaign to Prevent Gun Violence v. Salazar*,
　612 F. Supp. 2d 1 (D.D.C. 2009) .........................................................49, 50

*Chamber of Com. of U.S. v. Edmondson*,
　594 F.3d 742 (10th Cir. 2010) .................................................................15

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
　140 S. Ct. 1891 (2020) .............................................................................12

*Dep't of Transp. v. Pub. Citizen*,
　541 U.S. 752 (2004) .............................................................................39, 40

*Dine Citizens Against Ruining Our Env't v. Bernhardt*,
　923 F.3d 831 (10th Cir. 2019) .................................................................13

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
　528 U.S. 167 (2000) .................................................................................13

*Hall v. U.S. Dep't of Labor*,
　476 F.3d 847 (10th Cir. 2007) .................................................................11

*Harvey v. Udall*,
　384 F.2d 883 (10th Cir. 1967) .............................................................6, 21

*House v. U.S. Forest Serv.*,
　974 F. Supp. 1022 (E.D. Ken. 1997) ....................................................44, 46

*Hunt v. Wash. State Apple Advert. Comm'n*,
　432 U.S. 333 (1977) .................................................................................16

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. United States*,
735 F.2d 1525 (D.C. Cir. 1984) ................................................................12

*Idaho ex rel. Kempthorne v. U.S. Forest Serv.*,
142 F. Supp. 2d 1248 (D. Idaho 2001) .................................................46

*Klamath Siskiyou Wildlands Ctr. v. Boody*,
468 F.3d 549 (9th Cir. 2006) ..................................................42, 43, 46

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 224 (2024)...............................................................21, 24

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................................................................13, 14

*Massachusetts v. E.P.A.*,
549 U.S. 497 (2007)..........................................................................14

*Mkt. Synergy Grp., Inc. v. United States Dep't of Lab.*,
885 F.3d 676 (10th Cir. 2018) ...............................................................30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..................................................................12, 25

*Nat. Res. Def. Council v. McCarthy*,
993 F.3d 1243 (10th Cir. 2021) .............................................................42

*North Dakota v. U.S. Dep't of the Interior*,
No. 1:24-CV-00066, 2024 WL 4164939 (D.N.D. Sept. 12, 2024)........................21

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)...........................................................................5

*Olenhouse v. Commodity Credit Corp.*,
42 F.3d 1560 (10th Cir. 1994) ..........................................................11, 13

*Ore. Nat. Res. Council Fund v. Forsgren*,
252 F. Supp. 2d 1088 (D. Ore. 2003).................................................43, 46

*Perez v. Mortg. Bankers Ass'n*,
135 S. Ct. 1199 (2015).......................................................................12

*Pub. Emps. For Env't Resp. v. Nat'l Park Serv.*,
605 F. Supp. 3d 28 (D.D.C. 2022).....................................................47, 50

*Rest. L. Ctr. v. U.S. Dep't of Lab.*,
No. 23-50562, 2024 WL 4609380 (5th Cir. Aug. 23, 2024) .................................24

ii

*Serv. Emps. Int'l Union, AFL-CIO, v. Gen. Servs. Admin.,*
    830 F. Supp. 5 (D.D.C. 1993) ...................................................................31, 32, 33

*Shays v. Fed. Election Comm'n,*
    414 F.3d 76 (D.C. Cir. 2005) ................................................................................25

*Sierra Club N. Star Chapter v. LaHood,*
    693 F. Supp. 2d 958 (D. Minn. 2010) ...................................................................25

*Sierra Club v. Fed. Energy Regul. Comm'n,*
    867 F.3d 1357 (D.C. Cir. 2017) ............................................................................45

*Sierra Club v. Morton,*
    405 U.S. 727 (1972) ..............................................................................................14

*Sinclair Wyo. Ref. Co. LLC v. EPA,*
    114 F.4th 693 (D.C. Cir. 2024) .............................................................................25

*Taniguchi v. Kan Pacific Saipan, Ltd.,*
    566 U.S. 560 (2012) ..............................................................................................22

*Theodore Roosevelt Conservation P'ship v. Salazar,*
    661 F.3d 66 (D.C. Cir. 2011) ..........................................................................18, 19

*True Oil LLC v. Bureau of Land Mgmt.,*
    700 F. Supp. 3d 1004 (D. Wyo. 2023) ..................................................................21

*U.S. Sugar Corp. v. EPA,*
    113 F.4th 984 (D.C. Cir. 2024) .............................................................................24

*Union Pac. R.R. Co. v. Surface Transp. Bd.,*
    113 F.4th 823 (8th Cir. 2024) ...............................................................................24

*Via Christi v. Leavitt,*
    509 F.3d 1259 (10th Cir. 2007) ............................................................................11

*W. Energy All. v. Zinke,*
    877 F.3d 1157 (10th Cir. 2017) ....................................................................5, 6, 18

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.,*
    870 F.3d 1222 (10th Cir. 2017) ............................................................................44

*Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n,*
    82 F.4th 1273 (D.C. Cir. 2023) .............................................................................36

*Wyo. Outdoor Council,*
    171 IBLA 108 (2007) ............................................................................................19

iii

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
    165 F.3d 43 (D.C. Cir. 1999) ...............................................................12

**Statutes**

5 U.S.C. § 706 ...............................................................................................11

30 U.S.C. § 189 ...................................................................................7, 17, 22

30 U.S.C. § 191 .................................................................................................3

30 U.S.C. § 226 .........................................................................................6, 28

42 U.S.C. § 4332 .......................................................................................40, 46

43 U.S.C. § 1701 ...............................................................................................5

43 U.S.C. § 1702 .......................................................................................18, 19

43 U.S.C. § 1712 .........................................................................................5, 41

43 U.S.C. § 1732 ..................................................................................5, 18, 42

43 U.S.C. § 1732 .............................................................................................18

54 U.S.C. § 200402 .........................................................................................45

Act of Aug. 8, 1946, ch. 916, 60 Stat. 960.............................................7, 8

Act of Feb. 25, 1920, ch. 85, § 32, 41 Stat. 437 ..............................6, 17, 19

Act of June 3, 1948, ch. 379, § 6, 62 Stat. 289, 291 .......................................7

Energy Policy Act of 2005, 42 U.S.C. § 15921(a)(1)(A) ............................18

Mining & Minerals Policy Act of 1970, 30 U.S.C. § 21a.............................17

Pub. L. 83-561, 68 Stat. 648 (Aug. 2, 1954).................................................7

Pub. L. 86-705, § 3, 74 Stat. 781 (Sept. 2, 1960).......................................7, 8

Pub. L. No. 117-169, § 50,262, 136 Stat. 1818, 2056-58 (2022) ..................9

Great American Outdoors Act, Pub. L. 116-152, 134 Stat. 682 (Aug. 4, 2020) ..........................45

**Other Authorities**

40 C.F.R. § 1501.1 (2023) .............................................................................39

40 C.F.R. § 1501.4 (2023) .............................................................................40

iv

43 C.F.R. pt. 3120 ...........................................................................................................6

43 C.F.R. pts. 3160 & 3170 .............................................................................................6

43 C.F.R. § 46.210 .....................................................................................................40, 41

43 C.F.R. § 46.210(i) .......................................................................................................40

43 C.F.R. § 1601.0–5 .........................................................................................................5

43 C.F.R. § 1601.0–6 .........................................................................................................5

43 C.F.R. § 1610.1(b) .........................................................................................................5

43 C.F.R. § 1610.5–5 ........................................................................................................42

43 C.F.R. § 3104.2 (2023) ..........................................................................................14, 29

43 C.F.R. § 3104.3 (2023) ..........................................................................................14, 29

89 Fed. Reg. 30,916 (Apr. 23, 2024)
    .1, 2, 9, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 29, 30, 35, 36, 37, 39, 40, 42, 43, 44, 46, 47, 48, 49, 50

89 Fed. Reg. 35,442 (May 1, 2004) ..................................................................................39

H.R. Rep. No. 79-2446 ......................................................................................................7

*Oxford English Dictionary* .............................................................................................22

S. Rep. No. 79-1392 ...........................................................................................................8

S. Rep. No. 86-1549 ...........................................................................................................8

S. Rep. No. 86-1549 ...........................................................................................................8

*Webster's Third New Int'l Dictionary* (1986) ................................................................25

v

Petitioners Western Energy Alliance, Independent Petroleum Association of New Mexico, New Mexico Oil and Gas Association, North Dakota Petroleum Council, Petroleum Association of Wyoming, and Utah Petroleum Association (collectively, "Petitioners") respectfully submit this opening memorandum in support of Petitioners' challenge to the final rule the Bureau of Land Management ("BLM") published on April 23, 2024, titled Fluid Mineral Leases and Leasing Process, 89 Fed. Reg. 30,916 (Apr. 23, 2024) ("Leasing Rule"). *See generally* LRR_0075109.[1]

The Court should vacate and set aside the Leasing Rule. First, the Leasing Rule contradicts the fundamental directive Congress gave BLM in managing the public lands for oil and natural gas leasing and development, ignoring the Congressional mandate that BLM must promote that development and account for future generations' need for natural resources. BLM has, in fact, conceded that the Leasing Rule will frustrate and inhibit mineral development on federal lands.

Second, the Leasing Rule's increased bonding provisions are arbitrary and capricious. BLM failed to justify a need for revised bonding provisions, citing

---

[1] On September 10, 2024, Respondents filed their Notice of Lodging of Administrative Record and provided the Court with a thumb drive containing the administrative record. *See* Not. of Lodging Admin. R. (Sept. 10, 2024), ECF No. 24. So that the Court can easily access the record document from the index, Petitioners cite to the administrative record by the beginning bates number and, if necessary, the pinpoint citation—e.g., LRR_00XXXXX at XXXXX.

manufactured, nonexistent problems with the adequacy of existing bonding rules. BLM failed to engage with substantive comments the regulated community submitted. And BLM overlooked impacts to small businesses by incorporating provisions and reasoning that was not a logical outgrowth of the proposed rule.

Third, BLM failed to conduct adequate environmental analysis to support the Leasing Rule. The impact of the Leasing Rule effects an amendment to all BLM resource management plans where parcels have been identified as open to oil and natural gas leasing. BLM will now review expressions of interest to lease those already open lands according to newly codified subjective criteria. But any amendment of a resource management plan requires heightened environmental analysis, which BLM failed to do. BLM's reliance on an exclusion from the required environmental review is arbitrary because the impacts of the Leasing Rule are far more substantive than the administrative and financial nature BLM alleged. In sum, because BLM violated the standards for administrative action, the Court should vacate and set aside the Leasing Rule.

I. **RELEVANT BACKGROUND.**

The United States owns approximately 700 million subsurface acres of mineral estate. *See* LRR_0005055 at 5062. The Mineral Leasing Act establishes the framework under which the Secretary of the Interior leases and manages the development of these minerals. The Secretary exercises her statutory responsibilities

through BLM. *See* LRR_0007522 at 7526 ("BLM is responsible for overseeing the federal government's onshore subsurface mineral estate and manages approximately 700 million acres of subsurface mineral rights throughout the country, including the acreage it leases to companies for oil and gas development.").

Approximately 23 million mineral acres—roughly 3.3% of the federal mineral estate—was leased for oil and natural gas development at the end of FY 2022. *About the Oil and Gas Program*, Bureau of Land Mgmt.[2] And an even smaller amount—12.4 million mineral acres—are producing oil and natural gas in economic quantities. *See id.* Yet in FY 2023, the onshore federal oil and natural gas program generated approximately $14.1 billion on federal and Indian leases; and from October 2023 to August 2024, for a partial FY 2024, the program has already generated nearly $13 billion. *See* Dep't of Interior, Nat. Res. Revenue Data.[3] Approximately half of federal oil and natural gas royalty, rental fee, and bonus bid revenue is paid to the state in which the development occurred. *See* 30 U.S.C. § 191; *see also About the Oil and Gas Program*, Bureau of Land Mgmt. ("All Federal oil and gas royalty, rental fee, and bonus bid revenue is split about half between the U.S.

---

[2]    Available    at:    https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/about (last visited Nov. 3, 2024).
[3] Available at: https://revenuedata.doi.gov/ (last visited Oct. 25, 2024) (sorting the "Breakout" box to "Commodity").

4860-8572-9001.6

Treasury and the states were development occurred.").[4] "The amount of annual revenue that Federal mineral development provides to the U.S. Treasury is second only to that provided by the Internal Revenue Service." *About the Oil and Gas Program*, Bureau of Land Mgmt.[5]

At the state and local levels, revenues associated with oil and natural gas production fund, among other functions, law enforcement, infrastructure, first responder services, primary and secondary education, clinics, hospitals, and other civil services. *See, e.g.*, LRR_0054012 at 54017 ("[F]unding derived from mineral development constitutes a significant portion of revenue used to pay for essential services, including roads, fire protection, courthouses and judicial systems, libraries, landfills, hospitals, law enforcement, airports, recreation, public health, and senior citizen centers."); LRR_0054150 at 54156.

## A. FEDERAL OIL AND NATURAL GAS LEASING PROCESS.

The Federal Land Policy and Management Act, 43 U.S.C. §§ 1701-87 ("FLPMA"), governs the land use planning process that precedes federal oil and natural gas leasing. Among other considerations, BLM must plan to: (i) protect the quality of scientific, scenic, historical, ecological, environmental, air and

---

[4]    Available at: https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/about (last visited Nov. 3, 2024).
[5]    Available at: https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/about (last visited Nov. 3, 2024).

4

atmospheric, water resource, and archeological values, *see* 43 U.S.C. § 1701(a)(8); *and* (ii) account for the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands, *see* 43 U.S.C. § 1701(a)(12). Through an exhaustive National Environmental Policy Act ("NEPA") process involving extensive opportunities for public review and comment, resource management plans ("RMP") are prepared for all federal lands and resources. *See* 43 U.S.C. § 1712(a). Each BLM field office prepares an environmental impact statement ("EIS") that analyzes management alternatives for the lands and resources within the field office's boundaries. *See* 43 C.F.R. §§ 1601.0–6, 1610.1(b). "[A]pplicable regulations [] require that the public must have a chance 'to become meaningfully involved in and comment on the preparation and amendment of' [resource management plans]." *W. Energy All. v. Zinke*, 877 F.3d 1157, 1161 (10th Cir. 2017) (quoting 43 C.F.R. § 1610.2(a)).

FLMPA mandates that BLM "shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans." 43 U.S.C. § 1732(a). The RMPs establish which areas within each field office's boundaries are open to oil and natural gas leasing and which areas are closed. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 59 (2004) ("Generally, a land use plan describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps."); 43 C.F.R. § 1601.0–5(n)(2) (defining a RMP as establishing

"[a]llowable resource uses (either singly or in combination) and related levels of production or use to be maintained"). For open areas, the RMP analyzes impacts of reasonably foreseeable development and enumerates any stipulations needed to provide extra protection for sensitive resources in the plan area. All subsequent activity on designated lands, including oil and natural gas development, must conform to the RMPs. *See Zinke*, 877 F.3d at 1161-62.

The Mineral Leasing Act and its implementing regulations govern the next phase of federal oil and natural gas development. Parcels in areas identified as open for leasing in a RMP may be nominated for leasing through the submission of an expression of interest ("EOI"). *See* 43 C.F.R. pt. 3120. The Mineral Leasing Act requires that "[l]ease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b). After the issuance of a lease, BLM regulations then govern the development, operations, and production of oil and natural gas. *See* 43 C.F.R. pts. 3160 & 3170.

Unlike FLPMA, the Secretary's obligations under the Mineral Leasing Act do not involve weighing competing interests—Congress stated expressly that the Mineral Leasing Act's purpose is "[t]o promote the mining of coal, phosphate, oil, oil shale, and sodium on the public domain." Act of Feb. 25, 1920, ch. 85, § 32, 41 Stat. 437; *see also Harvey v. Udall*, 384 F.2d 883, 885 (10th Cir. 1967) (recognizing

6

that the Mineral Leasing Act's "purpose . . . was to promote the orderly development of the oil and gas deposits in the publicly owned lands of the United States through private enterprise" (internal quotation omitted)). "The Secretary of the Interior is authorized to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter . . . ." 30 U.S.C. § 189. In other words, the Mineral Leasing Act requires BLM's regulation of oil and natural gas to promote the development of the resource on federal lands.

And even where the Mineral Leasing Act has been substantively amended, the Act's central purpose has always been preserved. On August 8, 1946, for example, Congress amended the Act "to promote the development of oil and gas on the public domain." Act of Aug. 8, 1946, ch. 916, 60 Stat. 960. The 1946 law was designed "to stimulate the discovery of new petroleum reserves and the development of known petroleum reserves" by (i) applying a flat 12.5-percent royalty on production from all lands that were not within a known geologic structure; and (ii) enlarging the acreage position that a single lessee could hold within a state. H.R. Rep. No. 79-2446 at 2. The limitation on acreage holdings was expanded again in 1948, 1954, and 1960. *See* Pub. L. 86-705, § 3, 74 Stat. 781, 785 (Sept. 2, 1960) ("Revision Act"); Pub. L. 83-561, 68 Stat. 648 (Aug. 2, 1954) (amending the Mineral Leasing Act "to promote the development of oil and gas on the public domain"); Act of June 3, 1948, ch. 379, § 6, 62 Stat. 289, 291 (amending the Mineral Leasing Act "to

7

promote the development of certain minerals on the public domain"). Congress' desire to stimulate production reflected the nation's experience in World War II, which "demonstrated beyond peradventure of doubt that the salvation of this Nation demands that we develop our petroleum reserves to the utmost, to the end that this Nation shall not risk loss of either industrial or political leadership." S. Rep. No. 79-1392 at 1.

Congress later enacted the Mineral Leasing Act Revision of 1960, having determined that in the several years previous, "there ha[d] been a potentially dangerous slackening in exploration of domestic reserves of oil and gas so necessary for our security in war and peace." S. Rep. No. 86-1549 at 2." Among other changes, the Revision Act raised the minimum rental on oil and gas leases from 25 to 50 cents per acre and eliminated provisions that waived rental payments in the second and third year of a lease. Revision Act § 17(d). *Compare id.*, *with* Act of Aug. 8, 1946, 60 Stat. at 952 (waiving rentals "for the second and third lease years" on lands "not within any know geologic structure of a producing oil or gas field"). Congress reasoned that these changes would "add incentive to actual exploration and development, discourage excessive speculation in applying for and holding leases, and increase[] revenues to the Treasury and the States." S. Rep. No. 86-1549 at 6.

8

### B.    THE LEASING RULE

On July 23, 2023, BLM published the proposed Leasing Rule, categorical exclusion from NEPA, and economic analysis. *See* LRR_0053165 (proposed Leasing Rule); LRR_0053252 (proposed categorical exclusion). In part, the proposed Leasing Rule sought to implement the Congressional directives related to oil and natural gas leasing from the Inflation Reduction Act ("IRA")—e.g., increasing royalty rates, minimum per-acre bids, rental rates, and creating an EOI submission fee. *See* Pub. L. No. 117-169, § 50,262, 136 Stat. 1818, 2056-58 (2022). But the Leasing Rule extends beyond implanting the IRA's directives.

On April 12, 2024, BLM issued the final Leasing Rule.[6] On April 23, 2024, BLM published the rule in the *Federal Register*. *See generally* LRR_0075109. The Leasing Rule represents a sea change to BLM's oil and natural gas leasing program. While BLM contends the Leasing Rule will improve "the leasing process by ensuring proper stewardship of public lands and resources," the rule's impact will be to deter development of federal oil and natural gas, disproportionately affect small companies, and effectively close eligible and available lands to new leasing.

---

[6] Press Release, Bureau of Land Mgmt., BLM Ensures Fair Taxpayer Return, Strengthens Accountability for Oil and Gas Operations on Public Lands (Apr. 12, 2024), *available at* https://www.blm.gov/press-release/blm-ensures-fair-taxpayer-return-strengthens-accountability-oil-and-gas-operations.

Among other regulatory changes, the Leasing Rule: (1) increases the required bond per lease from $10,000 to $150,000, *see* LRR_0075109 at 75169; (2) increases the required statewide bond from $25,000 to $500,000, *id.*; (3) eliminates the option for nationwide and unit operator bonds, *id.* at 75170; (4) increases the royalty rate from 12.5- to 16.67-percent for all leases issued on or after August 16, 2022, *id.* at 75168; (5) increases the minimum per acre bid to $10 per acre, *id.* at 75167; (6) increases the rental rate to $3 per acre per year for the first two years, $5 per acre per year for the third to eighth year, and $15 per acre for every subsequent year, *id.*; (7) creates a $5 per acre fee for an EOI due upon the EOI's submission, *id.*; (8) creates or increases fees, which BLM will automatically increase for inflation, for various filings related to oil and natural gas development, *id.* at 75158-59; (9) codifies preference criteria for evaluating an EOI, including: (i) proximity to oil and natural gas development existing at the time of BLM's evaluation; (ii) the presence of fish and wildlife habitats or connectivity areas; (iii) the presence of historic properties, sacred sites, and other high value cultural resources; (iv) the presence of recreation and other important uses or resources; and (v) the potential for oil and gas development, *id.* at 75179; and (10) extends the term for applications for permit to drill from two to three years but limits the opportunity for term extensions, *id.* at 75190.

10

## II.  <u>STANDARD OF REVIEW.</u>

Petitioners seek review of final agency action under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"). Under the APA, the reviewing court must: (ii) "hold unlawful and set aside agency action" determined to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law," 5 U.S.C. § 706(2)(A)-(D); *see also Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (construing 5 U.S.C. § 706(2)(A)-(D) as providing "the generally applicable standards").

The Court must set aside agency action "unless it is supported by substantial evidence in the administrative record." *Via Christi v. Leavitt*, 509 F.3d 1259, 1271 (10th Cir. 2007) (quoting *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004) (internal quotation omitted)); *see also* 5 U.S.C. § 706(2)(E). In determining whether substantial evidence supports the agency's decision, "the court must also consider that evidence which fairly detracts from the [agency's] decision." *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 854 (10th Cir. 2007).

Agency action must be "based on a consideration of the relevant factors." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974). An agency must also "consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "It is a 'foundational principle of administrative law' that judicial review of agency action is limited 'to the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (quoting *Michigan v. Env't Prot. Agency*, 576 U.S. 743, 758 (2015)).

"The agency itself must supply the evidence of that reasoned decisionmaking in the statement of basis and purpose mandated by the APA"—i.e., the rule's preamble. *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. United States*, 735 F.2d 1525, 1531 (D.C. Cir. 1984). The agency's reasoning must appear in the regulatory preamble, *see id.*, because the preamble is the authoritative explanation of agency action. *See Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999) ("[W]e have often recognized that the preamble to a regulation is evidence of an agency's contemporaneous understanding of its

proposed rules."). "After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles." *Olenhouse*, 42 F.3d at 1575.

## III.    PETITIONERS HAVE STANDING.

Article III standing requires a petitioner to show:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Where an association sues on behalf of its members, the association must demonstrate: (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests at stake are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 181; *see also Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 840 (10th Cir. 2019). Petitioners have demonstrated Article III standing.

The Leasing Rule imposes injury-in-fact on Petitioners' members. When a petitioner is the target of government action, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or

requiring the action will redress it." *Lujan*, 504 U.S. at 561-62. Petitioners' members "participate at all stages of onshore federal oil and natural gas development regulated and impacted by the Leasing Rule." *See* Attach. A, Decl. of Kathleen Sgamma, ¶ 7 (Nov. 8, 2024) ("Sgamma Decl.").[7] Even if such direct regulation were not enough, the Leasing Rule also imposes significant new costs and compliance requirements on Petitioners' members. *See Sierra Club v. Morton*, 405 U.S. 727, 733-34 (1972) ("[P]alpable economic injuries have long been recognized as sufficient to lay the basis for standing, with or without a specific statutory provision for judicial review."). The Leasing Rule's increased costs will directly harm Petitioners' members. As two examples, BLM has: (1) created new fees or significantly increased existing costs for the filing of documents;[8] and (2) dramatically increased the required bonding for lease and statewide bonds.[9] Petitioners' members have already and will continue to be subject to these increased costs. Sgamma Decl. ¶ 11.

---

[7] Petitioners highlight the Alliance's declaration solely for brevity. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."). But the same standing analysis is satisfied for each of the trade associations challenging the Leasing Rule. *See* Attach. B, Decl. of Jim Winchester (Nov. 7, 2024); Attach. C, Decl. of Pete Obermueller (Nov. 8, 2024); Attach. D, Decl. of Rikki Hrenko-Browning (Nov. 8, 2024).

[8] *See, e.g.*, LRR_0075109 at 75115 (outlining BLM's creation of new fees) & 30965-66 (outlining filings that require a new or increased fee).

[9] *Compare* LRR_0075109 at 75169 (setting new minimum amounts at $150,000 and $500,000), *with* 43 C.F.R. § 3104.2 (2023) (setting previous $10,000 lease bond), *and* 43 C.F.R. § 3104.3(a) (2023) (setting previous $25,000 statewide bond).

14

Petitioners' members have also already expended time and money to train their personnel on compliance with the Leasing Rule, establishing a second basis for the satisfaction of the injury-in-fact prong. *Id.* ¶ 11; *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 756-57 (10th Cir. 2010) (finding "economic injuries in the form of implementation and training expenses" and potential non-compliance satisfied injury-in-fact). As these new regulatory requirements and costs come directly from the Leasing Rule's new requirements, the harm to Petitioners' members is traceable to the Leasing Rule.

Finally, the harm to Petitioners' members would be directly redressed through a successful result in this lawsuit. A declaration from this Court that the Leasing Rule violates the APA or BLM's governing statutes would relieve Petitioners from some, if not all, the injury the regulation causes.

Petitioners satisfy the other requirements for associational standing. First, the interests at stake in the Leasing Rule are germane to the Petitioners' purposes. The Alliance represents approximately 170 members involved in all aspects of environmentally responsible exploration and production of oil and natural gas on federal and Indian lands across the western United States. *See* Sgamma Decl. ¶ 4. For fifty years, the Alliance has promoted and advocated for the beneficial use and development of oil and natural gas, and the important economic, environmental, and energy security solutions the oil and gas industry provides. *See id.* ¶¶ 4-5. The

Alliance's work for its members includes advocating on federal legislative, regulatory, environmental, and public lands policy issues. *See id.* ¶ 5. The Alliance often appears before Congress and federal agencies and in the judicial system to represent its members. *See id.* Alliance members and staff participate actively in the resource management planning process by which lands are designated as open for oil and natural gas development and routinely participate in the NEPA review process for individual projects. *See id.* ¶¶ 6-7. Alliance members are among the companies that have submitted EOIs nominating parcels for lease in each of the states in which BLM has historically conducted onshore lease sales. *See id.* ¶ 7. Alliance members regularly participate in, and acquire leases through, federal lease sales. *See id*. Specific to the Leasing Rule, the Alliance submitted comments to BLM during the rulemaking process. *See generally* LRR_0070690.[10]

Second, nothing about the claims Petitioners assert nor the relief requested requires the participation of individual members. The Leasing Rule is nationally applicable to all onshore federal oil and natural gas leasing and development. Petitioners assert claims against the application of the new regulations to all their members. And Petitioners ask for no relief that is specific or particularized to any individual member. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977) ("Finally, neither the interstate commerce claim nor the request for

---

[10] *See also* LRR_0054407 (providing comments from additional Petitioners).

declaratory and injunctive relief requires individualized proof and both are thus properly resolved in a group context.").

Finally, as discussed above, Petitioners' members would otherwise have Article III standing to sue in their own right. Because Petitioners satisfy all the elements for associational and Article III standing, Petitioners advance valid claims.

## IV.   THE LEASING RULE VIOLATES THE MINERAL LEASING ACT'S CORE DIRECTIVE.

Since 1920, the Mineral Leasing Act has authorized the Secretary of the Interior to "prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter." 30 U.S.C. §189. Congress' stated purpose in enacting the Mineral Leasing Act was "[t]o promote the mining of coal, phosphate, oil, oil shale, and sodium on the public domain." Act of Feb. 25, 1920, ch. 85, § 32, 41 Stat. 437.

Congress has also determined that it is "in the national interest to foster and encourage private enterprise in," among other endeavors, "the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs." Mining & Minerals Policy Act of 1970, 30 U.S.C. § 21a. Congress has directed that access to federal lands for energy development must be efficient. Among other obligations, BLM is required "[t]o ensure timely action on oil and gas leases" and to effect policy that: (i) "ensure[s] expeditious compliance" with NEPA and any other

17

applicable environmental and cultural resources laws. Energy Policy Act of 2005, 42 U.S.C. § 15921(a)(1)(A). The Leasing Rule, however, accomplishes just the opposite. Through the Leasing Rule, BLM "is largely discouraging all operators from leasing and developing federal oil and natural gas." A.R. at LRR_0070690 at 70691.

FLPMA obligates BLM to "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). To meet this obligation, BLM must consider "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources." 43 U.S.C. § 1702(c). The result of this statutory scheme is that, while BLM has a responsibility to "prevent unnecessary or undue degradation of the [public] lands," 43 U.S.C. § 1732(b), accounting for the productivity of the federal mineral estate is a statutory imperative.

Because "FLPMA prohibits only unnecessary or undue degradation, not *all* degradation," BLM must ensure that regulatory measures do not prevent the extraction of federal minerals. *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 78 (D.C. Cir. 2011) (holding setbacks that protected sage-grouse but which prevented natural gas extraction did not satisfy BLM's obligation to balance development with conservation). The Interior Board of Land Appeals has interpreted "unnecessary or undue degradation" to mean the occurrence of "'something more

18

than the usual effects anticipated' from appropriately mitigated development." *Id.* at 76 (quoting *Biodiversity Conservation All.*, 174 IBLA 1, 5-6 (2008)). More than speculation is required: "Without evidence that future injury will occur, it cannot be argued that degradation of the lands will occur, . . . or that the future degradation is unnecessary or undue." *Wyo. Outdoor Council*, 171 IBLA 108, 121-22 (2007) (internal quotations marks omitted).

Because the Leasing Rule enacts provisions contrary to these directives and otherwise fails to consider the "relevant factors" Congress has prescribed in these statutes, the rule is both contrary to law and arbitrary and capricious and should be set aside. Nowhere in the Leasing Rule does BLM account for its statutory mandate from the Mineral Leasing Act to "[t]o promote the mining of coal, phosphate, oil, oil shale, and sodium on the public domain." Act of Feb. 25, 1920, ch. 85, § 32, 41 Stat. 437; *see generally* LRR_0075109-98. The Leasing Rule never even mentions the purpose of the Mineral Leasing Act.

Nor does the Leasing Rule meaningfully address FLPMA's mandate to "account [for] the long-term needs of future generations for renewable and nonrenewable resources." 43 U.S.C. § 1702(c). In the Leasing Rule's preamble, BLM references FLPMA's requirement twice. First, BLM references the requirement when acknowledging the statutes under which BLM manages the public lands for oil and natural gas development with no further explanation.

LRR_0075109. Second, BLM claims that its discretion in selecting which lands to lease—implemented through its EOI preference criteria in the Leasing Rule—will "direct the BLM's administrative resources to leasing tracts most likely to be developed, to reduce conflicts between oil and gas development and other public land uses that were not resolved in the resource management plans, and to 'take into account the long-term needs of future generations for renewable and nonrenewable resources.'" LRR_0075109 at 75112 (quoting 43 U.S.C. § 1702(c)). But nothing in the preamble explains how BLM's inappropriate attempt to further expand its subjective discretion for which lands to lease accounts for the Nation's need for nonrenewable resources like oil and natural gas. For example, commentors impressed on BLM that when an operator submits an EOI, "[t]he EOI itself represents a declaration from the nominee that the nominated area holds some level of potential for future oil and natural gas development and the $5 per acre fee, added via [the] IRA, grounds this declaration through a monetary commitment." LRR_0070690 at 70704. BLM is not directing where development is most likely— the operators are. And the RMP has already established which lands are open for leasing and considered potential resource conflicts and stipulations to address them. At its heart, BLM's quotation of its FLPMA mandate does nothing to provide a reasoned basis for how the Leasing Rule's provisions account for the Nation's need for oil and natural gas.

"When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits. The court fulfills that role by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 224, 2263 (2024) (internal citations and quotation marks omitted). Courts both before and after the enactment of *Chevron* deference have recognized the fundamental directive Congress gave BLM in the Mineral Leasing Act. *See, e.g.*, *Harvey*, 384 F.2d at 885 ("The purpose of the Mineral Leasing Act was to 'promote the orderly development of the oil and gas deposits in the publicly owned lands of the United States through private enterprise.'" (quoting Senate Subcommittee of the Committee on Interior and Insular Affairs, The Investigation of Oil and Gas Lease Practices, 84th Cong., 2nd Sess. 2 (1957))); *True Oil LLC v. Bureau of Land Mgmt.*, 700 F. Supp. 3d 1004, 1014 (D. Wyo. 2023); *North Dakota v. U.S. Dep't of the Interior*, No. 1:24-CV-00066, 2024 WL 4164939, at *4 (D.N.D. Sept. 12, 2024) ("The broad purpose of the MLA was to provide incentives to explore new, unproven oil and gas areas through noncompetitive leasing, while assuring through competitive bidding adequate compensation to the government for leasing in producing areas. The Act was intended to promote wise

4860-8572-9001.6

development of these natural resources and to obtain for the public a reasonable financial return on assets that belong to the public." (internal citations and quotation marks omitted)).

Even before *Loper-Bright*, agencies have never been free to exercise the discretion Congress has afforded them to enact regulations that contradict Congressional purpose. For example, BLM cites the Mineral Leasing Act's rulemaking authority for enacting the Leasing Rule. *See* LRR_0075109 at 75160, 75187-88, 75190. That rulemaking authority provides: "The Secretary of the Interior is authorized to prescribe necessary and proper rules and regulations and to do any and all things necessary to *carry out and accomplish the purposes of this chapter* . . . ." 30 U.S.C. § 189 (emphasis added). That purpose is to "promote" oil and natural gas development on federal lands. The Mineral Leasing Act leaves "promote" undefined, so it should be interpreted according to its ordinary meaning. *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The plain meaning of "promote" is "[t]o further the growth, development, progress, or establishment of (a thing); to advance or actively support (a process, cause, result, etc.); to encourage." *Promote*, *Oxford English Dictionary*.[11] The Leasing Rule does exactly the opposite. Both BLM's regulatory preamble and the structure of the Leasing Rule itself reveal

---

[11] Available at: https://www.oed.com/dictionary/promote_v?tab=meaning_and_use#28185401 (last visited Nov. 6, 2024).

that the Leasing Rule's object is to reduce the amount of land available for federal oil and natural gas leasing and make the conditions for operations on lands that are leased more restrictive.

In the economic analysis that accompanies the Leasing Rule, BLM recognizes that the Leasing Rule's provisions—specifically, related to increased bonding—may push operators to non-federal lands but claims BLM could not quantify the decrease in demand for federal acreage. LRR_00754577 at 74621 ("The increase in bonding costs might lead some operators to decide to pursue lease on state lands rather than Federal lands if the bonding requirements on state lands are cheaper."); *id.* at 74622 ("It is possible that the additional costs of bonding may incrementally reduce the number of oil and gas leases sought and acquired or the total number of Federal acres leased."). When BLM compared twenty-eight states' single-well and statewide bonding amounts to the minimum amounts in the Leasing Rule: (1) *only one out of twenty-eight states had either a higher per-well or statewide bond amount*, LRR_00754577 at 74623-25; (2) eighteen states had lower per-well bond amounts, *id.*; and (3) twenty-four had lower statewide bond amounts, *id.* The conclusion to draw from this data is that, in most states analyzed, the bond amounts are lower than the Leasing Rule's, and operators will be incentivized to lease and develop on non-federal lands.

4860-8572-9001.6

Federal courts routinely declare agency action and rulemaking contrary to law for violating the governing statutes' language and purpose—particularly so after *Loper-Bright*. *See, e.g.*, *Rest. L. Ctr. v. U.S. Dep't of Lab.*, No. 23-50562, 2024 WL 4609380, at *1, *9-*11 (5th Cir. Aug. 23, 2024) (vacating the Department of Labor's final rule "restrict[ing] when employers may claim a 'tip credit' for 'tipped employees' under the Fair Labor Standards Act" because "the Final Rule applie[d] the tip credit in a manner inconsistent with the FLSA's text" and "because it dr[ew] a line for application of the tip credit based on impermissible considerations and contrary to the statutory scheme enacted by Congress"); *Union Pac. R.R. Co. v. Surface Transp. Bd.*, 113 F.4th 823, 828, 838 (8th Cir. 2024) (vacating final rule promulgated by Surface Transportation Board "establish[ing] a new procedure for challenging the reasonableness of rail carrier rates in smaller cases, [called] the Final Offer Rate Review (FORR)," under which "the Board decide[d] a case by selecting either the shipper's or the rail carrier's final offer" in part because it fell "short of the statutory requirement that '*the Board* . . . prescribe the maximum rate" by "effectively prevent[ing] the Board from giving 'due consideration' to the statutory factors that the Board is required to consider in assessing a rate's reasonableness" and "by limiting the Board to the two final offers the parties propose in prescribing the maximum reasonable rate" (emphasis in original) (first quoting 49 U.S.C. § 10704(a)(1); and then quoting *id.* § 10701(d)(2))); *U.S. Sugar Corp. v. EPA*, 113

F.4th 984, 988, 993–95 (D.C. Cir. 2024) (concluding that final rule "classif[ying] some industrial boilers as 'new' sources of hazardous air pollutants even though they were built *before* the applicable emissions standards were proposed in 2020" was arbitrary because it is inconsistent with the surrounding statutory structure and internally inconsistent (emphasis in original)); *Sinclair Wyo. Ref. Co. LLC v. EPA*, 114 F.4th 693, 708–11 (D.C. Cir. 2024) (holding that EPA's interpretation of the Clean Air Act's Renewable Fuel Standard program's small refinery hardship exemption was contrary to law because it "goes beyond the plaining meaning of the statute" and the "EPA's policy justification for excluding nonratable RIN purchases as a ground for economic hardship is unmoored from the CAA").

## V.    THE LEASING RULE'S INCREASE IN MINIMUM BONDING AMOUNTS VIOLATES THE APA.

A decision "based on random or convenient selection or choice rather than on reason or nature" is the essence of both the legal and dictionary definition of arbitrary. *Webster's Third New Int'l Dictionary* 110 (1986). In the absence of a "rational justification" for the agency's action, the "APA's arbitrary and capricious standard" requires that the action be set aside. *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 97 (D.C. Cir. 2005); *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (noting that the agency must articulate a "rational connection between the facts found and the choice made"); *Sierra Club N. Star Chapter v. LaHood*, 693 F. Supp. 2d 958, 963 (D. Minn. 2010) (describing a change in agency policy without

explanation justifying the change as "the hallmark of an arbitrary and capricious decision"). BLM has not substantiated the existence of problem the Leasing Rule's minimum bonding provisions are meant to address.

### A.    BLM's Misplaced Focus on Orphaned Wells Targets a Supposed Problem That Largely Does Not Exist.

During the rulemaking process, Petitioners and other commenters noted that BLM's singular focus on orphaned or feared soon-to-be orphaned wells was misguided. *See* LRR_0070690 at 70693.[12] Petitioners emphasized that, in testimony to the Senate Committee on Energy & Natural Resources, the Deputy Secretary of the Department of the Interior estimated that there were only "37 orphaned oil and gas wells on BLM-managed lands." *Id.* at 70693 & n.8 (citing Attach. E, Letter from Christopher Salotti to the Hon. Joe Manchin at 5 (June 22, 2023) (enclosing the Deputy Secretary's responses to questions during the committee hearing)); *see also* LRR_0075109 at 75131 (recognizing that "[a]s of March 1, 2024, the BLM has identified 35 unplugged orphaned wells that were covered by nationwide bonds"). To put that number in perspective, there are "roughly 89,350 wells" on federal leases. Statement of Michael D. Nedd, Deputy Director, Operations, Bureau of Land

---

[12] *See* LRR_0070690 at 70694 ("BLM's utter focus on addressing orphaned wells through proposed increased bonds and other revisions aimed at finding noncompliant operators is arbitrary, capricious, and not based in fact. BLM must recognize its own facts: orphan wells are not the crisis it implies, and addressing orphan wells on federal lands is not the taxpayer emergency BLM leads the public to believe based on the preamble and proposed rules.").

Mgmt. (Sept. 19, 2023).[13] The thirty-seven orphaned wells equals just 0.04% of the wells on federal lands. The Deputy Secretary stated further that BLM had only pulled forty bonds to plug and abandon wells on federal lands. LRR_0070690 at 70693 & n.8 (citing Attach. E, Letter from Christopher Salotti to the Hon. Joe Manchin at 5 (June 22, 2023)). In other words, BLM's justification for increasing the minimum bond amounts for lease and statewide bonds by 1,500- and 2,000-percent, respectively, *for all bonded parties* cannot be squared with the actual data before BLM.

Make no mistake, Petitioners' members take their reclamation and plugging and abandonment obligations seriously. *See* LRR_0070690 at 76092-93. But the data BLM relies on to justify the increased bonding amounts indicates the supposed orphaned well problem is not one of national significance, but rather one that can be addressed by focusing regulatory efforts on the small number of bad actors. BLM already has this regulatory authority. The Mineral Leasing Act provides:

> The Secretary concerned shall, by rule or regulation, establish such standards as may be necessary to ensure that an adequate bond, surety, or other financial arrangement will be established prior to the commencement of surface-disturbing activities on any lease, to ensure the complete and timely reclamation of the lease tract, and the restoration of any lands or surface waters adversely affected by lease

---

[13]           Available       at:       https://www.doi.gov/ocl/onshore-oilgas-mismanagement#:~:text=The%20BLM%20currently%20manages%20over,chosen%20not%20to%20develop%20them. (last visited Nov. 6, 2024).

> operations after the abandonment or cessation of oil and gas operations
> on the lease.

30 U.S.C. § 226(g). BLM exercises this authority not only by setting an initial and minimum bond but also through conducting bond adequacy reviews. *See* LRR_0075109 at 75170 (outlining regulatory provision for increasing the amount of bonds); *see also* LRR_0073404 (containing *Oil and Gas Bonds Adequacy Reviews*, Instruction Mem. 2024-014, Bureau of Land Mgmt. (Feb. 7, 2024) ("IM 2024-014")). Indeed, BLM's current policy is to review the adequacy of each bond at least every five years to ensure that the bonding amount appropriately covers the risk factors for a given company. LRR_0073404 at 73405. The fact that BLM has identified only thirty-seven orphaned wells supports the efficacy of BLM's existing regulatory tools to manage the risk that any given well will be orphaned. The Leasing Rule's preamble offers that BLM chose to increase the minimum bond for *every* operator to address a purported concern over avoiding orphaned wells. But the administrative record demonstrates that there is no data to justify BLM's cited concern; and even if such data did exist (it does not), BLM has not provided any explanation why existing regulations that allow BLM to set bonds that account for the circumstances of individual operators and operations are insufficient to address any perceived problem related to orphan wells. Because BLM's explanation for increased bond amounts is unsupported and unexplained, it cannot sustain the basis for the Leasing Rule's bonding provisions.

4860-8572-9001.6

**B.    BLM Disregarded Significant Impacts to Small Business.**

The Leasing Rule dramatically increases the minimum amounts for lease and statewide bonds, raising those amounts by 1,500 and 2,000 percent, respectively. *Compare* LRR_0075109 at 75169 (setting minimum amounts at $150,000 and $500,000), *with* 43 C.F.R. § 3104.2 (2023) (setting previous $10,000 lease bond), *and* 43 C.F.R. § 3104.3(a) (2023) (setting previous $25,000 statewide bond). Petitioners and nearly ever other regulated commenter explained to BLM that the increased bond amounts "will be a significant financial burden on operators and small businesses, because sureties often require companies to post cash or security collateral." LRR_0075109 at 75128.[14] BLM swept these concerns aside, suggesting in the final Leasing Rule that the Small Business Administration ("SBA") bond

---

[14] *See, e.g.*, LRR_0070690 at 692 ("If bond levels are raised too high, they tie up significant amounts of capital in an unproductive capacity, adding another cost that, in combination with the numerous other costs of operating on federal lands and newly imposed through [the] IRA and this rule, lead to less development and less production."); *id.* at 70694-95; LRR_0054407 at 54419 ("[E]ven premiums comprising a small percentage of the Proposed Rule's sharply increased bonding requirements may impose a significant burden on the bottom line of a small business, particularly if those premiums must be paid each year of the lease."); LRR_0054012 at 54014 ("To help illustrate the impact that an increase in bonding amounts could have on operators, it is important to know that 85 percent of Wyoming operators in the oil and gas industry are considered small businesses, as defined by the [SBA]. One-third of the companies in Wyoming produce less than two percent of statewide production. These companies, although currently profitable, will be unlikely to absorb such an astronomical increase in bonding. The Wyoming Oil and Gas Conservation Commission has conservatively estimated that over 100 companies operating in Wyoming will have required minimum bond amounts that exceed their annual gross revenue.").

29

guarantee program would provide a safety net for those small operators most impacted by the bonding increases.

Before issuing the Leasing Rule, BLM never referenced the SBA bond guarantee program in the materials issued with the proposed rule and never raised the program as an option for alleviating the Leasing Rule's imposition of new financial burdens. *See* LRR_0053165-251. This failure alone constitutes error as the regulated community never had a chance to comment on the applicability or viability of the SBA's bond guarantee program. BLM cannot assert that a bonding program that relies on an operator's ability to bond through the SBA is a logical outgrowth of the proposed rule when the proposed rule did not contemplate use of the SBA program.[15]

Equally important, the record is devoid of any support that the SBA bond guarantee program applies to oil and natural gas bonding. What the record contains are two website screenshots of the SBA's website—one of the generic bonding page, LRR_0074536-42; and another of the size standards for small businesses,

---

[15] "A final rule qualifies as a logical outgrowth 'if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period.'" *Mkt. Synergy Grp., Inc. v. United States Dep't of Lab.*, 885 F.3d 676, 681 (10th Cir. 2018) (quoting *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079–80 (D.C. Cir. 2009)). Neither Petitioners nor any other participant in this rulemaking could have reasonably anticipated having to comment on the efficacy of incorporating a funding program that was never even mentioned in the proposed rule.

4860-8572-9001.6

LRR_0023395-96. The record contains no evidence that BLM confirmed that the SBA program will guarantee oil and natural gas bonds. "But unsubstantiated assumptions are insufficient justification and rational[e] to support the [agency's] promulgation" of regulations. *Serv. Emps. Int'l Union, AFL-CIO, v. Gen. Servs. Admin.*, 830 F. Supp. 5, 10 (D.D.C. 1993) (emphasizing that an agency must rely on evidence, and not conclusory statements, to justify a rulemaking).

If the SBA program did cover oil and natural gas bonding on federal lands at such advantageous financial terms, one would expect many small operators to already be using this program. Yet the administrative record contains no data documenting the oil and natural gas industry's use of the program—either data that BLM collected from the SBA or data that operators submitted to describe current bonding options. Having failed to undertake the due diligence necessary to support an understanding of how the Leasing Rule's bonding requirements would affect small businesses, BLM's novel approach to bonding must be rejected as arbitrary.

In *American Public Gas Association v. U.S. Department of Energy*, the Department of Energy ("DOE") published a final rule "that set more stringent efficiency standards . . . for 'commercial packaged boilers.'" 22 F.4th 1018, 1021 (D.C. Cir. 2022) ("*APGA I*"). Industry challenged the rule, "target[ing] the assumptions and data the DOE used to conclude that more stringent efficiency standards were economically justified." *Id.* at 1026. In running its economic

analysis, "the DOE assumed the distribution of efficiencies among shipped boilers is the same as the distribution of efficiencies across the models listed in the [Air-Conditioning, Heating & Refrigeration Institute] data base." *Id.* at 1027. The petitioners commented that DOE's model "did not account for the type of building to which boilers were assigned" and thus "failed to recognize that a purchaser of commercial packaged boilers would rationally consider the costs and benefits of its investment and is likely to buy the boiler that produces the best economic performance for its building." *Id.* Responding to the petitioners' comments in the final rule, "the DOE dismissively noted that 'development of a complete consumer choice model, to support an alternative to random assignment in the no-new-standards case, for boiler efficiency would require data that are not currently available, as well as recognition of the various factors that impact the purchasing decision.'" *Id.* (quoting 85 Fed. Reg. 1592, 1638 (Jan. 10, 2020)). The DOE also listed "several possible market failures" that might justify the rule, but "provided no[] actual evidence that these market failures affect the market for commercial packaged boilers and thus justify the assumptions that underly its analysis." *Id.*

The court explained that the "assignment of efficiencies to the buildings in the sample was a crucial part of the analysis supporting the DOE's conclusion that a more stringent standard was warranted" and that the "significant concerns the petitioners raised about this assignment therefore demand a more complete

32

response." *Id.* The court noted, however, that "[i]nstead of producing evidence of some market failure in this specific market, the DOE essentially said it did the best it could with the data it had." *Id.* The court held that "the DOE's lackadaisical response would have been inadequate" under the normal APA review standard because DOE failed to "engage the arguments raised before it," indicating "a failure to consider an 'important aspect of the problem.'" *Id.* at 1027–28 (first quoting *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 11, 13-14 (D.C. Cir. 2015); and then quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

On remand, the agency published a supplement to the final rule "respond[ing] to the three challenges raised in" the first case. *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1335 (D.C. Cir. 2023) ("*APGA II*"). The supplement supported the DOE's "use of random assignment with a more detailed explanation of the various market failures and behavioral biases," citing new "corroborating datasets to demonstrate that boilers of various efficiency levels "are installed in a variety of building types and that the building characteristics do not correlate strongly with the existing boiler efficiency." *Id.* at 1337 (quotation marks omitted). Industry challenged the supplement, arguing in part "that the DOE should have provided notice and comment since the [supplement] relied on new studies and documentation." *Id.* at 1336-37. The DOE argued that "notice and comment was

4860-8572-9001.6

unnecessary on remand because the Final Rule merely advanced a hypothesis and some supporting explanation, and the Supplement provided additional support for that hypothesis . . . but . . . did not reject or modify the hypothesis such that additional comment was necessary." *Id.* at 1337 (quotation marks omitted). The court rejected the DOE's argument, emphasizing that "the additional materials referenced in the Supplement provided 'entirely new information critical to the [Agency's] determination' of life-cycle costs." *Id.* at 1338 (alterations in original and quotation marks omitted) (quoting *Cmty. Nutrition Inst. v. Block*, 749 F.2d 50, 58 (D.C. Cir. 1984)). The court held that "the Agency should have provided an opportunity for notice and comment as required by the APA" because it "relied upon [the studies and datasets] for the first time on remand." *Id.*

Similar to the *APGA* cases, Petitioners here raised serious concerns that increasing "minimum bond amounts will be a significant financial burden on operators and small businesses[] because sureties often require companies to post cash or security collateral." LRR_0075109 at 75128. BLM dismissed these concerns, noting for the first time that "[t]he [SBA] helps small businesses guarantee performance bonds issued by certain surety companies" and that operators would only "need to make a payment of $900 for an individual bond or $3,000 for a statewide bond to SBA[] . . . to obtain a surety bond without requiring the company to post cash or security collateral." *Id.* BLM also stated it "conducted a review of

small entities operating on Federal oil and gas leases based upon public data" and concluded that "there will not be a significant economic impact on small entities in the RFA." *Id.*

Like the DOE in *APGA I*, which relied on a key assumption and provided no actual evidence to support its assumption, BLM relies on the assumption that the SBA guarantee program can sufficiently service affected operators without producing any actual evidence to determine whether the SBA program even applies to oil and natural gas bonding. "All in all, if public comments raise relevant and significant concerns about the costs associated with a proposed rule, then the agency should provide a reasoned response to those comments." *Bloomberg L.P. v. Sec. & Exch. Comm'n*, 45 F.4th 462, 477 (D.C. Cir. 2022). BLM did not provide a reasoned response because it did not explain how the SBA's guarantee program adequately addresses commenters' serious concerns about financial hardships for small businesses.

And like the DOE in *APGA II*, which relied on data for the first time in its supplement without providing petitioners an opportunity to comment, BLM relies on "public data" for the first time in the final Leasing Rule to conclude that the higher bonding amounts will not significantly impact small businesses without providing an opportunity to comment. Even worse, if BLM relied on any actual data about the applicability of the SBA program, BLM did not disclose that data. "It 'is the

agency's duty to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules.'" *Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1283 (D.C. Cir. 2023) (quoting *Owner-Operator Indep. Drivers v. FMCSA*, 494 F.3d 188, 199 (D.C. Cir. 2007) (cleaned up)). BLM failed to do so here and thus "[a] 'genuine interchange' about the accuracy of the data did not occur during the rulemaking" because "no usable information was provided to the public." *Id.* (quoting *Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 530 (D.C. Cir. 1982)).

BLM acted arbitrarily when it failed to engage the arguments commenters raised, failed to adequately consider an important aspect of raising minimum bond amounts, failed to provide technical data it relied on to justify the Leasing Rule, and provided no opportunity to comment on and challenge its crucial assumption that most affected operators would be able to participate in the SBA guarantee program. Because any of these flaws alone would require vacatur of the Leasing Rule's bonding provisions, those provisions must be set aside.

### C.    BLM Bonding Assumptions Are Inaccurate.

To further compound BLM's error in its bonding analysis, BLM incorporated arbitrarily low numbers into the agency's assumed bonding costs. In the proposed Leasing Rule, BLM estimated bond premiums would cost small operators "1 to 3.5 percent of the bond value" per year. LRR_0053165 at 53212. In the proposed rule

preamble, BLM cites just one generic webpage from one company—Insureon—to support this assumption. *Id.* (citing LRR_0049988). That webpage goes on to state that premium rates "can range anywhere from 1%-15% of the total bond amount." LRR_0049988 at 89; *see also* LRR_0050047 at 50048 ("The premium you might have to pay will vary, depending on the type of surety bond you need and the factors considered during underwriting. It can range from 0.5% to *more than 10% of your bond amount*." (emphasis added)). Insureon's website clarifies that the industry type and the attendant risks to the insured activity can increase the bond premium. LRR_0049988 at 49991 ("Higher risk businesses, such as construction companies, may have to pay a higher percentage of the surety bond amount (for example, 10% or more) as a premium."). Another surety company specifically acknowledges: "[o]il and gas surety bonds are considered risky and can be difficult to place." LRR_0050312 at 50314.

Petitioners and other commenters raised to BLM that its assumption for the cost of surety bonds to operators—particularly small operators—did not align with the market for surety bonds. LRR_0070690 at 70694 ("BLM's assumption that all operators can access the surety bond market at 1 to 3.5% annual premiums is inaccurate."). Echoing the websites for surety bonds on which BLM relied, Petitioners noted "[o]perator-specific factors like company age and financial status influence the ability to qualify for uncollateralized bonds," and explained that

"[m]any small companies will likely only be able to access the surety market at rates of 6 to 7% plus large amounts of collateral." *Id.* at 70694-96. BLM did not consider any of these points.

Rather than incorporate the full context of BLM's own sources or the bonding information received from commenters, BLM actually *decreased* the range of what it believed bond premiums would cost and modeled the regulatory impact at 1- and 2-percent per year. LRR_0074577 at 74606; *see also id.* at 74613-26 (outlining economic impact of bond increases). BLM ignored the bond premium ranges and risk factors attendant to the oil and natural gas industry described in BLM's own sources and disregarded comments received from the regulated community advising that small businesses could not access surety bonds within the range BLM assumed.

This is more than a failure in arithmetic, it was of fundamental importance to BLM's analysis of the Leasing Rule's impact. BLM cited a study that estimated "even wells producing at 5 BOE/day can remain profitable but an additional $800 a month in costs may not allow continued operation of these wells." LRR_0074577 at 74650 (citing LRR_0075213 at 75219 ("What you cannot do is add even $800/month in overhead costs (be it G&A, management team fee, COPAS overhead . . . , contract operating fee, or otherwise) and still be profitable.")). Using the range of surety premiums industry provided to BLM—but ignoring the fact that small operators must also post collateral—will make these wells unprofitable and lead

operators to prematurely plug and abandon them. For example, a seven-percent annual premium on the increased lease bond amount equals an increased cost to an operator of $875 per month; a seven-percent annual premium on the increased statewide bond amount equals an increased cost to an operator of $2,916 per month. Both are more than the added monthly costs that BLM's source forecasted would "not allow continued operation of these wells." LRR_0074577 at 74650. This is exactly the result commenters told BLM the Leasing Rule would create. BLM erred by failing to engage with industry comments—ignoring them completely—and basing the analysis of the Leasing Rule's impact on economic inputs unsupported by substantial evidence in the record.

## VI.  <u>BLM FAILED TO CONDUCT REQUIRED NEPA ANALYSIS.</u>

"NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004); *see* 40 C.F.R. § 1501.1(a) (2023).[16] The statute requires federal agencies to "include in every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by

---

[16] Petitioners cite to the 2023 version of the Council for Environmental Quality regulations as those were the effective regulations at the time of the decisions made in the Leasing Rule. *See* Nat'l Env't Policy Act Implementing Reguls. Revisions Phase 2, 89 Fed. Reg. 35,442 (May 1, 2004) (codifying changes to the regulatory text implementing NEPA).

the responsible individual," 43 U.S.C. § 4332(2)(C), evaluating the environmental impact of the proposal—in other words, an EIS. *Dep't of Transp.*, 541 U.S. at 757. However, an agency may prepare a more limited document—an Environmental Assessment—"if the agency's proposed action neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS." *Id.*

Council on Environmental Quality regulations also allow agencies to identify "categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment or environmental impact statement." 40 C.F.R. § 1501.4(a) (2023). These exceptions from NEPA are referred to as a "Categorical Exclusion." *Id.*

During the rulemaking process, Petitioners and other commenters urged BLM to conduct required NEPA analysis for the Leasing Rule. *See, e.g.*, LRR_0070690 at 70691, 70702-03. BLM refused—instead relying on 43 C.F.R. § 46.210(i), a provision that allows for a categorical exclusion from NEPA for agency actions that are purely administrative or financial and "regulation[s] . . . whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process." *See* LRR_0074668 at 74669-70. The Leasing Rule's regulatory preamble includes numerous assertions that the

rule's application will have environmental impacts—positive impacts in BLM's estimate—that cannot be measured at this time:

> BLM expects that the expedited timing for reclamation of orphaned wells from increased bonding could provide benefits related to wildlife, vegetation, soil erosion, climate change (reduced greenhouse gas emissions from unplugged orphaned wells), visual and aesthetic resources, ground water, and allowing the surface land to be utilized for other uses sooner (for example, for grazing purposes). *The BLM cannot currently quantify these benefits using the information available to the BLM.*

LRR_0075109 at 75131 (emphasis added); *see also id.* at 0075150. BLM's application of 43 C.F.R. § 46.210(i) misunderstands both the limitations of categorical exclusions and overlooks significant environmental impacts that can and should be evaluated now.

BLM failed to conduct the requisite NEPA analysis in at least two respects. First, BLM's implementation of new amorphous criteria for evaluating EOIs amounts to an amendment to all RMPs with lands available for oil and natural gas leasing. RMP amendments require BLM to prepare an EIS. Second, BLM arbitrarily invoked an inapplicable Categorical Exclusion for a rule that clearly involves significant impacts to the human environment.

### A.    BLM's EOI Preference Criteria Constitutes an Amendment to all RMPs with Lands Open for Oil and Natural Gas Leasing.

FLPMA requires BLM to "develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." 43

U.S.C. § 1712(a). BLM "*shall* manage the public lands under principles of multiple use and sustained yield, *in accordance with the land use plans developed by [BLM] under [43 U.S.C. §] 1712 of this title . . . .*" *Id.* § 1732(a) (emphasis added). BLM's regulations mandate an amendment to RMPs from "the need to consider monitoring and evaluation findings, new data, *new or revised policy, a change in circumstances or a proposed action that may result in a change in the scope of resources uses* or a change in the terms, conditions and decisions of the approved plan. 43 C.F.R. § 1610.5–5 (emphasis added). "Amendments to [RMPs] . . . require environmental analysis under NEPA." *Nat. Res. Def. Council v. McCarthy*, 993 F.3d 1243, 1246 (10th Cir. 2021); 43 C.F.R. § 1610.5–5. BLM's regulations leave no room to amend a RMP through a Categorical Exclusion. 43 C.F.R. § 1610.5–5 (requiring either an Environmental Assessment or EIS).

The Leasing Rule effectively amends all RMPs that designate lands as open and available to oil and natural gas leasing and development. The rule will restrict, if not eliminate, development on millions of acres of federal mineral estate that are presently open to leasing under BLM's applicable RMPs. In other words, BLM has drastically altered the scope of land use for oil and natural gas leasing and development and the terms, conditions, and decisions of the existing RMPs. *See Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 556 (9th Cir. 2006) ("BLM *must* amend a management plan when an action is proposed that changes either 'the

scope of resource uses' or the 'terms, conditions and decisions' of the plan." (quoting

43 C.F.R. § 1610.5–5 (2006))). For example, the EOI preference criteria override

the determinations already made in the RMP process to select which lands within

the RMP are open and available for leasing. LRR_0070690 at 70691 ("The

preference criteria further allow BLM to circumvent its own planning and public

processes and not offer a parcel based on other resource considerations already

addressed through lease stipulations and land use restrictions."); *see also*

LRR_0053968 at 53972 ("The BLM cannot use these proposed amendments to

restrict leasing within acreage designated for leasing in approved RMPs across the

nation unless amendments to the RMPs are approved after the appropriate plan

amendment process."). Even if the RMP allows leasing for a potential parcel, the

Leasing Rule adds another level of subjective criteria for BLM to analyze before

BLM will offer any nominated parcel for a lease sale. LRR_0075109 at 75140

(acknowledging the EOI preference criteria will aid BLM "in directing leasing

towards areas that are more likely to produce oil and gas and that are less likely to

have conflicts with other uses"). The EOI preference criteria effect a substantive

change to each RMP and their existing selection of lands available for oil and natural

gas leasing. *See Klamath Siskiyou Wildlands Ctr.*, 468 F.3d at 556-60 (holding

BLM's change in the management of the red tree vole required a RMP amendment

as it changed the terms and conditions of the applicable RMPs); *Ore. Nat. Res.*

*Council Fund v. Forsgren*, 252 F. Supp. 2d 1088, 1100-07 (D. Ore. 2003) (concluding the Forest Service's application of new lynx preservation guidelines where none existed in the analogous land use plans under the National Forest Management Act constituted a *de facto* amendment or a failure to amend the plans and the Forest Service failed to conduct required NEPA for the implementation of the guidelines); *House v. U.S. Forest Serv.*, 974 F. Supp. 1022 (E.D. Ken. 1997) (concluding the Forest Service's implementation of three policies required amendment to the land use plans under the National Forest Management Act and NEPA compliance). The result is tantamount to an amendment to the controlling RMPs.

The Leasing Rule constitutes a significant adjustment to the status quo with environmental and socioeconomic impacts that requires NEPA analysis. Restricting oil and natural gas development on federal lands does nothing to reduce demand for or consumption of oil and natural gas products. Yet BLM has not taken a hard look (or any look) at the environmental impact of shifting production from federal lands to non-federal domestic and foreign sources, where environmental standards may be less stringent and production less sustainable. *See WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1226 (10th Cir. 2017) (observing that agencies must analyze, among other categories, "reasonably foreseeable indirect effects").

BLM has not examined the environmental justice impacts of shifting production from often rural and remote federal public lands to population-adjacent locations where privately owned minerals predominate. *See Sierra Club v. Fed. Energy Regul. Comm'n*, 867 F.3d 1357, 1368 (D.C. Cir. 2017) (observing that NEPA requires an agency take a "hard look" at environmental justice issues).

Perhaps most glaring, BLM has not conducted any examination of how reducing oil and natural gas development on federal lands will affect federal lands themselves. Revenues from oil and gas development on federal leases is the primary source of funding for conservation on federal lands. Under the Great American Outdoors Act, Pub. L. 116-152, 134 Stat. 682 (Aug. 4, 2020), 50-percent of all energy development revenue payable to the United States, up to $1.9 billion annually, are to be deposited into the National Parks and Public Legacy Restoration Fund. *See* 54 U.S.C. § 200402(b)(1). This money is to be used "for priority deferred maintenance projects in the [National Park] System, in the National Wildlife Refuge System, on public land administered by the [BLM], for the Bureau of Indian Education schools, and in the National Forest System." *Id.* § 200402(e)(1). Because this provision is effective only through the close of fiscal year 2025, *see id.* § 200402(b)(1), leasing policies that diminish the federal government's ability to maximize this revenue stream in the near term directly undermine the federal government's ability to protect, restore, and enhance these public assets.

45

Like all federal agencies, BLM was required, "to the fullest extent possible," to comply with NEPA when taking "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). Restricting or reducing oil and natural gas development by substantively altering the lands available for lease "will certainly have a demonstrable impact on the physical environment – the world around us, so to speak – and is the very action upon which Congress intended NEPA to apply." *Idaho ex rel. Kempthorne v. U.S. Forest Serv.*, 142 F. Supp. 2d 1248, 1259 (D. Idaho 2001) (citing *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983)); *see Klamath Siskiyou Wildlands Ctr.*, 468 F.3d at 560-62 (holding BLM's *de facto* amendment to the applicable RMPs required the agency to conduct either an environmental assessment or environmental impact statement); *Ore. Nat. Res. Council Fund*, 252 F. Supp. 2d at 1100-07 (concluding the Forest Service's *de facto* amendment to the applicable land use plans required NEPA compliance); *House*, 974 F. Supp. at 1034-36 (same).

Because BLM had a statutory obligation to complete NEPA analyses before issuing the Leasing Rule and failed to meet that obligation, the Leasing Rule is procedurally defective and must be vacated.

### B.    BLM Inappropriately Relied on a Categorical Exclusion.

BLM invoked a Categorical Exclusion that "encompasses two alternative types of policies: 1) those 'that are of an administrative, financial, legal, technical,

or procedural nature;' and 2) those 'whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collective or case-by-case.'" *Pub. Emps. For Env't Resp. v. Nat'l Park Serv.*, 605 F. Supp. 3d 28, 57 (D.D.C. 2022) (citing 43 C.F.R. § 46.210(i)). Directly after declaring the Leasing Rule will "update the BLM's process for leasing to ensure the protection and proper stewardship of the public lands," BLM contends exclusion under only the first prong as "the changes are administrative in nature and will not result in any direct environmental effects." LRR_0074668 at 74669; *see also id.* at 74670 ("This categorical exclusion is appropriate in this situation, because the rule is administrative and financial in nature, complies with the categorical exclusion being applied, and will not result in direct effects on the environment.").

BLM arbitrarily relied on this Categorical Exclusion. First, through the Leasing Rule, BLM codified preference criteria for evaluating EOIs that had previously been established in an instruction memorandum—IM 2023-0007. LRR_0075109 at 75141 ("BLM has been applying the preference criteria in this way through the BLM's policy IM 2023-007 . . . ."); LRR_0073143 (containing IM 2023-007). At the time BLM implemented IM 2023-007, when faced with classifying the policy as "Administrative or Mission Related," BLM classified it as "Mission Related." LRR_0073143 at 731144. BLM's mission "is to sustain the health,

diversity, and productivity of public lands for the use and enjoyment of present and future generations." *Our Mission*, Bureau of Land Mgmt.[17] In other words, when just a policy, BLM thought implementation of preference criteria for evaluating EOIs went to its core mission of protecting the public lands—not just an administrative function as BLM now claims.

The text of the regulations also supports the conclusion that the EOI preference criteria are intended to effect substantive changes to which lands will be offered for leasing and development. Rather than a process reactive to EOIs that operators nominate, BLM will select parcels for sale through application of criteria that BLM has chosen: (1) concentrating new leasing near existing development, (2) protecting species and habitat, (3) considering cultural sites and resources, (4) factoring in recreational value, and (5) preferring to only lease parcels with *known* potential for development. LRR_0075109 at 75179. BLM admits that the EOI preference criteria are designed to aid "BLM in directing leasing towards areas that are more likely to produce oil and gas and that are less likely to have conflicts with other uses." LRR_0075109 at 75140. BLM has done nothing less than concede that the lands which will be offered for lease under the Leasing Rule are different from those that could have been offered for lease before the Leasing Rule was promulgated.

---

[17] https://www.blm.gov/about/our-mission (last visited Oct. 31, 2024)

Second, BLM's minimum bond increase goes past a merely administrative or financial impact. BLM's entire goal of the bond increase is to ensure timely plugging and reclamation of orphaned wells. As discussed above, BLM expects that change to have substantive environmental impact well beyond any purely administrative or financial function. Like its EOI preference criteria policy in IM 2023-007, BLM also considers its bonding policies as "Mission Related." *See* LRR_0073404 at 73405.

In *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1 (D.D.C. 2009), the Department of the Interior ("DOI") promulgated a final rule allowing possession of operable firearms in national parks without preparing an environmental assessment or EIS. DOI invoked in *Brady Campaign* the same Categorical Exclusion BLM does here with the Leasing Rule. *Id.* at 15 (citing 43 C.F.R. § 46.210(i)). DOI argued that an environmental analysis was not required because its rule had no environmental impacts—that the rule permitted possession, not discharge, of operable weapons. The court, however, rejected this logic, noting that the appropriate inquiry is whether an action will result in any foreseeable environmental impact, not whether the action authorizes such impacts. "Were the Court to adopt Defendants' logic, a rule that amended regulations to allow persons to dump containers of toxic waste in national parks could qualify for a categorical exclusion as an amendment of a 'legal nature,' provided the rule also required that the containers not leak or otherwise have an impact on the environment." *Id.* at 17

n.12. The court in *Brady Campaign* concluded that DOI's examination of "what the [action] authorized as opposed to the foreseeable consequences that would occur as a result of the [action]" was "sufficient by itself to render the DOI's decision to invoke a categorical exclusion arbitrary and capricious." *Id.* at 17. *See also Pub. Emps. For Env't Resp.*, 605 F. Supp. 3d at 56-62 (concluding the National Park Service arbitrarily relied on the same Categorical Exclusion BLM invokes for the Leasing Rule when the Service implemented a new e-bike policy and related rule that was not administrative in nature and the environmental impacts were not too broad to analyze).

## VII.  <u>CONCLUSION.</u>

The BLM violated the APA in enacting the Leasing Rule. The Leasing Rule is inconsistent with the nature of the regulatory authority that the Mineral Leasing Act grants the Secretary. The Leasing Rule arbitrarily attempts to address concerns that have not been substantiated, ignoring technical comments submitted to the record and disregarding the full context of data that BLM collected. And BLM failed to conduct the environmental analysis that NEPA requires for regulatory action of this breadth and impact. Because BLM's rulemaking process was procedurally inadequate and the resulting Leasing Rule is substantively flawed, the Court should vacate and set aside the Leasing Rule.

Submitted respectfully this 8th day of November, 2024,

4860-8572-9001.6

/s/ Alexander K. Obrecht
Alexander K. Obrecht
Mark S. Barron (*pro hac vice*)
BAKER & HOSTETLER LLP
1801 California Street, Suite 4400
Denver, Colorado 80202
Telephone: 303.861.0600
Facsimile: 303.861.7805
aobrecht@bakerlaw.com
mbarron@bakerlaw.com

L. Poe Leggette
Bailey Bridges (*pro hac vice*)
811 Main Street, Suite 1100
Houston, TX 77002-6111
Telephone: 713.751.1600 / Facsimile:
713.751.1717
pleggette@bakerlaw.com
bbridges@bakerlaw.com

*Attorneys for Petitioners*

4860-8572-9001.6

## <u>CERTIFICATE OF COMPLIANCE</u>

This memorandum complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this memorandum contains 12,611 words, excluding parts of the memorandum Fed. R. App. P. 32(f) exempts.

The brief complies with the typeface and type style requirements of D. Wyo. Local Civ. R. 10.1(a) and Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Times New Roman, fourteen-point font size.

*/s/ Alexander K. Obrecht*
Alexander K. Obrecht

4860-8572-9001.6

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2024, a copy of the foregoing **PETITIONERS' OPENING MEMORANDUM ON THE MERITS** was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


*/s/ Alexander K. Obrecht*
Alexander K. Obrecht

53