Shannon Anderson (Wyo. Bar No. 6-4402)     Melissa Hornbein (MT Bar No. 9694)
414 Gladstone St.                          (*pro hac vice*)
Sheridan, WY 82801                         WESTERN ENVIRONMENTAL LAW CENTER
(307)763-0995                              103 Reeder's Alley
sranderson720@gmail.com                    Helena, MT 59601
                                           (406)708-3058
Allyson Beasley (NM Bar No. 152658)        hornbein@westernlaw.org
(*pro hac vice*)
WESTERN ENVIRONMENTAL LAW CENTER           Morgan O'Grady (NM Bar No. 159184)
409 E. Palace Ave #2                       (*pro hac vice*)
Santa Fe, NM 87501                         WESTERN ENVIRONMENTAL LAW CENTER
(505)570-5565                              409 E. Palace Ave #2
beasley@westernlaw.org                     Santa Fe, NM 87501
                                           (505)570-5566
                                           ogrady@westernlaw.org

*Counsel for Intervenor-Respondents*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| WESTERN ENERGY ALLIANCE, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DEB HAALAND, in her official capacity | ) | |
| as Secretary of the Interior, and UNITED | ) | |
| STATES BUREAU OF LAND MANAGEMENT, | ) | Case No. 1:24-cv-00100-KHR |
| | ) | |
| Federal Respondents, | ) | |
| | ) | |
| CENTER FOR BIOLOGICAL DIVERSITY, | ) | |
| CITIZENS FOR A HEALTHY COMMUNITY, | ) | |
| FRIENDS OF THE EARTH, MONTANA | ) | |
| ENVIRONMENTAL INFORMATION CENTER, | ) | |
| PRAIRIE HILLS AUDUBON SOCIETY, | ) | |
| SIERRA CLUB, and WESTERN | ) | |
| ORGANIZATION OF RESOURCE COUNCILS, | ) | |
| | ) | |
| Intervenor-Respondents. | ) | |

## CONSERVATION GROUPS' OPPOSITION TO PETITIONERS' OPENING
## MEMORANDUM ON THE MERITS

Table of Contents

Table of Authorities ......................................................................... iii

INTRODUCTION.................................................................................1

BACKGROUND....................................................................................3

   I.     LEGAL FRAMEWORK..............................................................3

       A. The Federal Land Policy and Management Act ("FLPMA")....................4

       B. BLM's Authority to Manage Production and Surface Use Rights to Protect the Public Interest ...........................................................................5

   II.    THE NEED FOR BONDING REFORMS .................................................9

   III.   THE LEASING RULE ...........................................................................11

ARGUMENT .......................................................................................14

   I.     THE LEASING RULE DOES NOT VIOLATE THE MLA OR FLPMA ....................................................................................................14

       A. Petitioners Misread the MLA and its "Core Directive" ...........................15

       B. FLPMA Requires BLM to Consider the Public Interest—Not "Promote" Oil and Gas Extraction..............................................................................22

       C. BLM had Discretion to Regulate More Aggressively to Protect the Public Welfare ...............................................................................................27

   II.    THE LEASING RULE'S BONDING REFORMS ARE NOT ARBITRARY OR CAPRICIOUS ...........................................................29

       A. The Bonding Increases in the Leasing Rule Are Necessary for BLM to Fulfill its Statutory Obligations and Protect the Public Interest ..............31

B.  The Record Supports BLM's Decision to Raise Minimum Bonding Amounts in the Leasing Rule .................................................... 34

CONCLUSION ....................................................................................................... 40

Table of Authorities

Cases:

*Boesche v. Udall,*
    373 U.S. 472 (1963) ..................................................................6–7, 16, 16–17

*California v. Udall,*
    296 F.2d 384 (D.C. Cir. 1961) ................................................................15–16

*Devon Energy Corp. v. Kempthorne,*
    551 F.3d 1030 (D.C. Cir. 2008) ..............................................................15–16

*Duesing v. Udall,*
    350 F.2d 748 (D.C. Cir. 1965) ...............................................................20–21

*Haley v. Seaton,*
    281 F.2d 620 (D.C. Cir. 1960) ...............................................................20–21

*Indep. Petroleum Assoc. v. DeWitt,*
    279 F.3d 1036 (D.C. Cir.2002) ....................................................................6–7

*Kleppe v. New Mexico,*
    426 U.S. 529 (1976) ..........................................................................................8

*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369 (2024) ........................................................................................21

*McLennan ex rel. Wilbur,*
    283 U.S. 414 (1931) ................................................................................17, 18

*Mineral Policy Ctr. v. Norton,*
    292 F.Supp.2d 30 (D.D.C. 2003) ....................................................................5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...............................................................................35, 38–39

*Nat'l Mining Ass'n v. Zinke,*
    877 F.3d 845 (9th Cir. 2017) ........................................................................25

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
    565 F.3d 683 (10th Cir. 2009)..............................................................23, 24

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004)..............................................................4, 23, 26

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    661 F.3d 66 (D.C. Cir. 2011) ........................................................22

*Udall v. Tallman*,
    380 U.S. 1 (1965) ........................................................16, 20

*U.S. v. Locke*,
    471 U.S. 84 (1985) ........................................................8

*Utah Shared Access All. v. Carpenter*,
    463 F.3d 1125 (10th Cir. 2006)........................................................5

*W. Energy All. v. Biden*,
    No. 21-CV-13-SWS, 2022 WL 18587039 (D. Wyo. Sept. 2, 2022) ......20–21

*W. Energy All. v. Salazar*,
    709 F.3d 1040 (10th Cir. 2013)........................................................20

*Wilbur v. U.S. ex rel. Barton*,
    46 F.2d 217 (D.C. Cir. 1930) ........................................................18

*Wyoming v. Dep't of Interior*,
    22-cv-747-CVS 2024 WL 5264647 (D. Wyo. Dec. 31, 2024) ....................21

Constitution:

U.S. Constitution, art. IV, § 3, cl. 2........................................................8

Statutes:

Mineral Leasing Act, 30 U.S.C. §§181 et seq.........................................2
30 U.S.C. § 187 ........................................................5, 19–20
30 U.S.C. § 189 ........................................................7, 16
30 U.S.C. § 226(a)........................................................20–21, 21

30 U.S.C. § 226(g) ...................................................................9, 12, 18–19, 30, 31

30 U.S.C.A. § 226(m) ............................................................................................7

42 U.S.C. § 4331(a) and (b) .................................................................................6

42 U.S.C. § 15907(a)(2) ......................................................................................10

42 U.S.C. § 15907(a)(5) ......................................................................................10

Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 et seq. ..................2

43 U.S.C. § 1701(a)(7) ........................................................................................23

43 U.S.C. § 1701(a)(8) .....................................................................................7, 23

43 U.S.C. § 1702(c).............................................................................3, 4, 24, 25, 27

43 U.S.C. § 1702(h) ............................................................................................26

43 U.S.C. § 1712 ...................................................................................................7

43 U.S.C. § 1732(a) ..........................................................................................5, 24

43 U.S.C. § 1732(b) ......................................................................................5, 7, 24, 31


Infrastructure Investment and Jobs Act,
    Pub. L. No. 117–58, 135 Stat. 429 (2021) ....................................................12


Inflation Reduction Act of 2022,
    Pub. L. No. 117–169, 136 Stat. 1818 ...........................................................12


Other Authorities:

43 C.F.R. § 3104.1(a) ...........................................................................................12

89 Fed. Reg. 30,916 (April 23, 2024) .....................................................................1

U.S. Dep't of Interior, Off. of the Solic., Opinion M-37039, *The Bureau of Land Mgmt's Authority to Address Impacts of its Land Use Authorizations through Mitigation* (Dec. 21, 2016) ...............................................8, 8–9, 14–15, 26–27, 33

## INTRODUCTION

For over a century, oil and gas companies have extracted resources from federal public lands to further their own narrow interests—and unduly shifted the associated burdens and costs of pollution, well plugging, and reclamation to the broader public. The Bureau of Land Management's federal fossil fuel program has historically enabled this injustice, despite the agency's statutory directives to protect the public welfare in managing public lands and resources. Outdated, inadequate oil and gas leasing regulations and insufficient reclamation bonding are among the myriad and well-documented problems that have plagued the program––perpetuating economic harms to taxpayers, environmental damage to federal public lands, and health harms to the millions of people who live, work, and recreate on or near them.

Federal Respondents (collectively, "BLM") have taken modest but important steps towards addressing parts of this problem—and fulfilling their associated statutory responsibilities—by promulgating the Fluid Mineral Leases and Leasing Process Rule ("Leasing Rule" or "Rule"), 89 Fed. Reg. 30,916 (April 23, 2024), LRR_0075109-98. The Rule, in pertinent part, implements long-overdue bonding and fiscal reforms and reflects Congress's changes to the federal oil and gas program in the Inflation Reduction Act ("IRA") and Infrastructure Investment and Jobs Act ("IIJA"). *See* LRR_0075109. These include the first increases to

minimum oil and gas bonding amounts in over half a century, to address

deficiencies identified by the Government Accountability Office ("GAO") and the

Interior Department's Office of the Inspector General ("OIG"), and "to ensure that

reclamation costs are not borne by the American Public." *Id.*

Petitioners Western Energy Alliance et al. wrongly claim that these

reasonable and necessary reforms in BLM's Leasing Rule violate core

Congressional directives of the Mineral Leasing Act ("MLA"), 30 U.S.C. §§181–

287, and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§

1701–1787—apparently because the Rule fails to "promote" unbridled oil and gas

leasing and development or to provide absolute assurance that increased bonding

amounts won't negatively affect "small" oil and gas operators. Based on their

inaccurate characterization of BLM's authority under the MLA, FLPMA, and the

Leasing Rule itself, Petitioners ask the court to vacate the Rule—and to ignore

established law recognizing BLM's responsibility to protect the public welfare, and

attendant broad discretion in managing federal lands and minerals.

Far from the "sea change to BLM's oil and gas leasing program" that

Petitioners allege, Pet. Br. at 2, the Rule and its bonding "reforms" are in fact

moderate and long-overdue course corrections. In implementing the Leasing Rule,

BLM has simply taken necessary steps towards remedying deficiencies in existing

rules and fulfilling its clear statutory directives under FLPMA and the MLA (while

also completing rulemaking compelled by the IRA and IIJA). Petitioners contort these directives and minimize well-documented problems the Rule seeks to address to bolster their claims that the Leasing Rule is arbitrary and contrary to Congressional intent.

By insisting that the MLA and FLPMA require BLM to elevate the narrow interests of fossil fuel companies over the broader public interest, however, it is Petitioners who ask the court to reinterpret the law in contravention of Congressional mandates. Granting Petitioners the relief they seek would perpetuate an unjust taxpayer-subsidized leasing program, entrench outdated rules that are incongruent with BLM's statutory obligations, and effectively rob BLM of the discretion necessary to fulfill its responsibilities in managing federal lands and resources "to meet the present and future needs of the American people" while "conform[ing] to changing needs and conditions." 43 U.S.C. § 1702(c). The court should deny Petitioners' request for relief and uphold the Leasing Rule.

## BACKGROUND

### I.  LEGAL FRAMEWORK

Federal Respondents' brief thoroughly addresses the relevant legal framework, *see* Fed. Resp. Br. at 2-11, including the Interior Secretary's (and by extension, BLM's) broad discretion *not* to lease federal public lands for oil and gas under the MLA. *Id.* at 2-5. Accordingly, this section of Intervenors' brief is intended only to

provide additional context on statutory provisions not directly addressed by Federal Respondents that Intervenor-Respondents believe are central to BLM's authority and obligations in this case.

### A. The Federal Land Policy and Management Act ("FLPMA")

FLPMA functions independently of, but complementary to, the Mineral Leasing Act in guiding BLM's management of public lands and resources. FLPMA directs BLM to manage public lands under the principle of "multiple use management," which requires balancing "the many competing uses to which land can be put, 'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) (alteration in original) (quoting 43 U.S.C. § 1702(c)). This "multiple use" mandate requires BLM to look beyond short-term extractive uses and manage public lands and resources to "meet the present *and future* needs of the American people" while "conform[ing] to changing needs and conditions … tak[ing] into account the long-term needs of future generations." 43 U.S.C. § 1702(c) (emphasis added). Ultimately, BLM must provide for the "harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment." *Id.*

FLPMA also requires that "[i]n managing the public lands [BLM] shall ... take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). This forward-looking directive to *prevent* unnecessary or undue degradation is the "heart" of FLPMA's substantive requirements. 43 U.S.C. § 1732(b); *Mineral Policy Ctr. v. Norton*, 292 F.Supp.2d 30, 33, 41–43 (D.D.C. 2003). Written in the disjunctive, it requires BLM to prevent degradation that is "unnecessary" and, *separately*, degradation that is "undue." *Id.* at 41–43. Each of these protective mandates applies to all BLM planning and management decisions, including the Leasing Rule. 43 U.S.C. § 1732(a); see also, *Utah Shared Access All. v. Carpenter,* 463 F.3d 1125, 1136 (10th Cir. 2006) (finding that BLM's authority to prevent degradation is not limited to the Resource Management Plan planning process).

## B. BLM's Authority to Manage Production and Surface Use Rights to Protect the Public Interest

The Leasing Rule is entirely congruent with the MLA's fundamental mandate that BLM manage federal public lands not just to ensure sustainable, responsible development of renewable and non-renewable resources but more fundamentally to "safeguard[] … the public welfare." 30 U.S.C. § 187. Together,

the MLA, the National Environmental Policy Act ("NEPA")[1] and FLPMA

underscore that management of the federal mineral estate is carried out to further

the *public interest*. As Conservation Groups emphasized in comments on the

proposed Leasing Rule, "[i]nsofar as development of federal oil and gas resources

is carried out by private interests, such interests are subordinate to and cabined by

the full sweep of BLM's authorities and responsibilities, including FLPMA and

NEPA." LRR_0070743.

Accordingly, federal onshore oil and gas lease rights are conditional,

conferring only the "opportunity" to develop a lease if it otherwise meets the

requirements of federal law, and subject to conditions that ensure such compliance.

LRR_0070744. Federal oil and gas leases are *not* an entitlement to unbridled

mineral development in whatever manner private industry sees fit. *Id.* Indeed,

according to long-standing judicial precedent, "Congress under the [MLA] has …

subjected the lease to exacting restrictions and continuing supervision by the

Secretary … In short, a mineral lease does not give the lessee anything

approaching the full ownership of a fee patentee, nor does it convey an

---

[1] *See* 42 U.S.C. § 4331(a) and (b) and discussion in Conservation Groups'
comments on the Proposed Rule, LRR_0070721-22; LRR_0070740-45.
Conservation Groups do not address Petitioners' NEPA claims in this brief in
recognition of the fact that Federal Respondents have done so. Conservation
Groups agree that Petitioners' de facto RMP amendment theory fails, for the
reasons articulated by Federal Respondents. *See* Fed. Resp. Br. at 42-46.

unencumbered estate in the minerals." *Boesche v. Udall,* 373 U.S. 472, 477-78

(1963); *see also Indep. Petroleum Assoc. v. DeWitt,* 279 F.3d 1036, 1039 (D.C.

Cir.2002) (finding the MLA affords "rather sweeping authority 'to prescribe

necessary and proper rules and regulations and to do any and all things necessary

to carry out and accomplish the purposes of [the leasing statutes].'") (quoting 30

U.S.C. § 189). The MLA also authorizes BLM to reduce the rate of oil and gas

production over a defined time period, limiting the amount of extraction and

associated pollution—including greenhouse gas emissions—that would result. *See,*

*e.g.,* 30 U.S.C.A. § 226(m) (authorizing the Interior Secretary to "alter or modify

from time to time the rate of prospecting and development and the quantity and

rate of production" under a cooperative or unit plan). The grant of lease rights is

thus:

> [S]ubject to BLM's retained duties and authorities to, *inter alia*, fulfill
> FLPMA's multiple use mandate through the protection of non-mineral
> multiple uses such as "air and atmospheric" values; balance resource use
> and impacts with resource protection through planning and "without
> permanent impairment of the productivity of the land and quality of the
> environment"; and, "by regulation or otherwise," to "take any action
> necessary prevent unnecessary or undue degradation of the lands."

LRR_0070744, citing 43 U.S.C. §§ 1701(a)(8), 1712, 1732(b). The modern,

standard lease form (Form 3100-11) further illustrates the limited nature of federal

mineral lease rights, stating that they are "subject to applicable laws, the terms,

conditions, and attached stipulations of the lease, the Secretary of Interior's

regulations and formal orders in effect as of lease issuance, *and to regulations and formal orders hereafter promulgated* when not inconsistent with lease rights granted or specific provisions of the lease." LRR_0070744 (emphasis added).

As the Supreme Court has held, "[e]ven with respect to vested property rights, a legislature generally has the power to impose new regulatory constraints on the way in which those rights are used, or to condition their continued retention on performance." *U.S. v. Locke*, 471 U.S. 84, 104 (1985). This regulatory power is consistent with the distinctive authority conferred to Congress and, by extension through statute, to BLM, by the U.S. Constitution's Property Clause. LRR_0070722.[2] The Property Clause grants Congress the "[p]ower to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. As the Supreme Court has instructed, "while the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, we have repeatedly observed that '[t]he power over the public land thus entrusted to Congress is *without limitations.*'" *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976) (emphasis added). *See also* LRR_0070722-23, citing Solicitor's Opinion M-37039 at 9 ("[t]he

---

[2] Citing Interior Solicitor's Opinion M-37039, *The Bureau of Land Management's Authority to Address Impacts of its Land Use Authorizations through Mitigation* (Dec. 21, 2016). Available at https://www.doi.gov/sites/doi.gov/files/m-37039-the-blms-authority-to-address-impacts-of-its-land-use-authorizations-through-mitigation.pdf [Hereinafter Solicitor's Opinion M-37039].

Supreme Court has long recognized that Congress exercises plenary power over the use of and activities on federal property. The capacious scope of this authority reflects the United States' dual role as both proprietor and regulator of federal lands.").

## II.    THE NEED FOR BONDING REFORMS

Until BLM promulgated this Leasing Rule, the agency had not updated its oil and gas bonding amounts to account for inflation or new drilling technologies in over six decades. LRR_0053168; LRR_0054330; LRR__0070746. Unsurprisingly, the GAO has found that BLM's outdated bonding requirements were wildly insufficient to ensure the timely reclamation required by the MLA, 30 U.S.C. § 226(g). LRR_0004931, 37-38. As a result of those findings, GAO recommended that BLM take steps to adjust bond levels to better reflect reclamation[3] costs, and BLM concurred. LRR__0004941. In discussing the need for the proposed Rule, BLM acknowledged that its existing minimum bond amounts were,

> outdated, expose the Federal Government to significant financial risks in the event of bankruptcies, and delay 'complete and timely' reclamation and restoration of lease tracts, which can cause or exacerbate a range of environmental issues, including methane leaks,

---

[3] GAO defines "reclamation" to mean "all of the actions and costs to reclaim a well, including well plugging and surface reclamation, and to restoring any lands or surface waters adversely affected by oil and gas operations." *See* LRR_0004918.

surface and groundwater contamination, interference with agricultural
activities, and degraded wildlife habitat.

LRR_0053168, citing LRR_0004914-51 (GAO Report 19-615).

Inadequate bonds have also contributed to a growing orphaned and idle well[4]
crisis —and unjustly forced taxpayers to bear the burden of reclamation costs that
should be borne by the oil and gas industry. *See, e.g.*, LRR_0054329-39;
LRR_0070746-57; LRR_0050548; LRR_0074628-29; LRR_0004418, 21, 30. As
the OIG found in a 2018 report that informed the Leasing Rule, inadequately
bonded idle wells are particularly risky to the Federal Government, U.S. taxpayers,
and the environment. LRR_0053167 (Proposed Rule background), citing
LRR_0004415-46 (OIG Report). They can easily fall into disrepair, and pose a
heightened risk of becoming orphaned, creating an undue burden on taxpayers to
shoulder millions of dollars in plugging and reclamation costs. *Id. See also*
LRR_0054329, 34-35; LRR_0070754; Fed. Resp. Br. at 5-6, (citing
LRR_0004418, and GAO report identifying over 2,000 idle, unreclaimed wells at
risk of becoming orphaned, with a total estimated reclamation cost exceeding $330

---

[4] *See* 42 U.S.C. § 15907(a)(2) (defining "idle well" as one that has been "non-
operational" for 4 or more years and "for which there is no anticipated beneficial
future use") and 42 U.S.C. § 15907(a)(5) (defining "orphan well" with respect to
federal, Tribal, and state lands). Generally, orphaned wells are those no longer
being used for production, injection, or monitoring, and without an operator of
record responsible for plugging and remediation. *See also* LRR_0021253-54
(BLM's IM 2021-039, defining orphan wells).

million), 27, 32. Moreover, idle and abandoned wells can contribute to significant climate-damaging, health-harming methane emissions. *See* LRR_0054341; LRR_0070747; LRR_0004923; LRR_0050519-20.

Conservation Groups' members understand the consequences of inadequate bonds and both idle and orphaned wells firsthand. Growing numbers of unsightly, derelict abandoned wells and associated infrastructure mar federal public lands near where members live, work, and recreate, and compound ongoing health, safety, and environmental impacts from thousands of active wells.[5] Strong oil and gas bonding regulations are essential to preventing and mitigating these impacts.

## III.    THE LEASING RULE

To address the compelling need for bonding increases and other fiscal reforms identified by the GAO and OIG, and to better align its leasing regulations with its statutory obligations, BLM published the proposed Leasing Rule ("Proposed Rule") on July 23, 2023. *See* LRR_0053165-251. As BLM explained in the Executive Summary:

> [M]any of the [federal fossil fuel] program's regulatory requirements are outdated, do not adequately protect the fiscal interests of the American public, and do not promote leasing practices that are consistent with diligent development requirements and multiple-use and sustained-yield principles. This proposed rule seeks to update the existing regulations accordingly.

---

[5] *See* ECF No. 31-1, at 018-022 (Léger Decl. ¶¶ 13-20); 059 (Johnson Decl. ¶ 8); 005-008 (Nichols Decl.)¶¶ 17-27); 067-072, 074-076 (Molvar Decl. ¶¶ 11-15, 20-23); 078-080 (Wilbert Decl. ¶¶ 6, 8-10); 048 (Mahaffey Decl. ¶ 17).

LRR_0053165.

BLM cited two primary reasons for undertaking the rulemaking: first, to reflect changes to the federal onshore oil and gas program made in the recently-enacted IRA (Pub. L. 117–169) and IIJA (Pub. L. 117–58), and second, to "enhance administration" of the program "consistent with the BLM's multiple use and sustained yield mission" mandated by FLPMA. LRR_0053166. Within the latter category, BLM's bonding reforms aim to "reduce taxpayer exposure to reclamation-related liabilities" and satisfy the MLA's requirement that BLM require bonds sufficient to ensure "complete and timely reclamation" of the lease tract and restoration of any adversely affected lands. LRR_0053168, citing 30 U.S.C. § 226(g). To accomplish this, the Leasing Rule raises individual lease bond minimums from $10,000.00 to $150,000.00, raises statewide bond minimums from $25,000.00 to $100,000.00, and eliminates blanket "nationwide" bonds and "unit operator" bonds that left thousands of wells severely under bonded. LR_0053168, 204; LR_0075169; 43 C.F.R. § 3104.1(a), Table 1. These bonding reforms are a primary target of Petitioners' challenge to the Final Rule.

BLM accepted public comment on the Proposed Rule through September 22, 2023, LRR_0075109, and Conservation Groups timely submitted detailed comments and exhibits during that period. *See* LRR_0050632-35; LRR_0054327-42; LRR_0054516-21; LRR_0054543-55100; LRR_0055101-8167;

LRR_0058168-213; LRR_0070712-72. After considering over 200,000 public comments, most of which supported the Rule, BLM published the final Leasing Rule ("Final Rule") on April 23, 2024. LRR_0075109-98. According to BLM, the Final Rule is "the first comprehensive update to the Federal onshore oil and gas program's regulatory framework since 1988." LRR_0075109. And the bonding increases are the first updates to financial assurance requirements since 1951 (statewide bonds) and 1960 (individual lease bonds). LRR_0053168.

In comments on the proposed Rule, Conservation Groups strongly supported the bonding reforms—even as they urged BLM to align bonding amounts with *full* well plugging and reclamation costs and otherwise strengthen bonding requirements for oil and gas operations on federal public lands relative to the draft rule. *See* LRR_0054327-42*;* LRR_0070746-57. In urging BLM to adopt full-cost bonding, Conservation Groups explained that lesser measures will inevitably result in a continuation of the status quo whereby public lands and American taxpayers bear an unfair burden of industry pollution and associated costs—albeit to a lesser degree than in the past. LRR_0054329-32; LRR_0070746-47, 50-53. In addition to their comments on bonding reforms, Conservation Groups also urged BLM to exercise its ample statutory authority and discretion under FLPMA and the MLA more expansively in the Final Rule and adopt a holistic, "lifecycle" approach to regulation of the federal fluid mineral program "to address interwoven climate,

ecological, and biodiversity crises and ensure BLM can fulfill its nondiscretionary statutory obligations to protect public lands and resources for future generations." LRR_0070715. *See also* LRR_0054516-20 (calling for climate guardrails and leasing denial criteria); LRR_0054341 and LRR_0058168-213 (calling for BLM to take steps "to ensure that GHG emissions are considered during the federal onshore oil and gas leasing, drilling, plugging, and reclamation processes.").

Ultimately, BLM declined to adopt both full-cost bonding and Conservation Groups' proposed lifecycle approach and robust accounting for GHG emissions in the Final Rule, and instead retained the more circumscribed scope of the Proposed Rule, with its primary emphasis on modest but necessary fiscal reforms.

## ARGUMENT

### I.    THE LEASING RULE DOES NOT VIOLATE THE MLA OR FLPMA

Petitioners fabricate a conflict between the Leasing Rule and Congressional mandates based on incomplete and inaccurate characterizations of the MLA and FLPMA. However, both the record and well-established law show that the Leasing Rule is consistent with, and indeed necessary for, fulfilling BLM's statutory obligations. Contrary to Petitioners' improperly narrow reading, neither the MLA nor FLPMA requires BLM to "promote" oil and gas extraction or elevate it over other multiple uses. Nor does the Leasing Rule foreclose leasing and development. In fact, BLM could have gone much further than it did in the Leasing Rule to

exercise its "plenary" and "capacious" authority and discretion to protect the public welfare—including the discretion not to lease, and to otherwise limit oil and gas extraction and production on federal public lands. *See* LRR_0070717, n. 19, citing Solicitor's Opinion M-37039 at 9; LRR_0070722-23. Indeed, it is telling that BLM declined Conservation Groups' and many other commenters' requests to do just that. Petitioners' strained attempt to construe the MLA and FLPMA's core directives in favor of oil and gas industry interests—and in turn, hamstring BLM's authority and discretion to manage public lands and resources *for the public interest*— should be rejected.

### A. Petitioners Misread the MLA and its "Core Directive"

Petitioners wrongly claim that BLM's duties under the MLA "do not involve weighing competing interests" because (according to Petitioners) the "purpose of the MLA is simply "to 'promote' oil and gas development on federal lands." Pet. Br. at 17, 22. This characterization is both inaccurate and misleading. Petitioners have not demonstrated a meaningful risk that the Rule will, in fact, reduce leasing. Even if their unsupported assertions were true, however, they do not provide a basis for legal relief. The Court should reject Petitioners' assertion that any rule or requirement that has the effect of reducing oil and gas development on public lands is in tension with the MLA.

Courts have made clear that legislative statements about "promot[ing]" oil and gas development refer to *wise and responsible* development that promotes the public interest—not "to obtain sales for the gas from these reserves on Government land at any price." *California v. Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961) (explaining that the "Secretary of the Interior is the statutory guardian of th[e] public interest"); *see also Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1033 (D.C. Cir. 2008) (explaining that the MLA was intended "to promote wise development of . . . natural resources . . . that 'belong' to the public" (quotation omitted)). When administering federal oil and gas resources, the Interior Department has broad authority in determining what the public interest requires. *See* 30 U.S.C. § 189 (authorizing Department "to do any and all things necessary" to effectuate the purposes of the MLA); *Boesche*, 373 U.S. at 477–78 (recognizing breadth of Department's authority under MLA).

The history of the MLA demonstrates that promoting *responsible* development in the public interest is not the same thing as allowing *more*, let alone promoting unbridled oil and gas development. When Congress first adopted the MLA in 1920, its goal was to assert greater federal authority over the development of publicly owned minerals. The MLA replaced pre-1920 law, which treated oil and gas deposits as placer mining claims and transferred fee title to the company developing them, with a leasing system that retained ownership and control in the

federal government. *Boesche*, 373 U.S. at 480–81; *see also Udall v. Tallman*, 380 U.S. 1, 21–22 (1965). The Supreme Court has described the "dominant theme" of 1920 Congressional debates over the MLA as "[c]onservation through control." *Boesche,* 373 U.S. at 480–81 (citing H.R. Rep. No. 65-1138, at 19 (1919) (Congress sought to "reserv[e] to the Government the right to supervise, control, and regulate the development of natural resources" (internal alterations omitted))).

"Conservation through control" did not mean promoting more oil and gas development. To the contrary, when the MLA was enacted in 1920, "conservation" was thought of in terms of conserving oil and gas resources. Congress sought to conserve publicly owned minerals from wasteful development and overproduction because legislators at the time were concerned that federal oil and gas resources were at risk of being exhausted. *See U.S. ex rel. McLennan v. Wilbur*, 283 U.S. 414, 419 (1931) (noting that when the MLA passed, "a widely accepted view [anticipated that a] decline of petroleum production in the United States was imminent"). This represented a national security concern because the U.S. Navy had converted its warships from coal to oil in the early Twentieth Century.[6] At the same time, demand for oil was increasing due to the advent of the automobile. Thus, the original purpose of the MLA was not to increase federal oil and gas

---

[6] Lindley, *Of Teapot Dome, Wind River and Fort Chaffee Federal Oil and Gas Resources,* 10 Natural Resources and the Environment 21, 21-22 (Summer 1995).

development, but to manage it in a manner that conserved public resources and

protected the national interest.[7]

Indeed, just a few years after the MLA was enacted, the Interior Department

in 1929 completely halted oil and gas leasing and permitting. To address a glut of

oil and gas, the Department imposed a moratorium on new leases and permits.

*McLennan*, 283 U.S. at 419 (noting that the moratorium was issued in response to

"an enormous increase [of petroleum production] and a consequent troublesome

surplus"); *Wilbur v. U.S. ex rel. Barton*, 46 F.2d 217, 218-19 (D.C. Cir. 1930)

(summarizing facts). The U.S. Supreme Court upheld the moratorium as a valid

exercise of the government's authority under the MLA "to effectuate the

conservation policy of the President." *McLennan*, 283 U.S. at 418.  Nowhere in its

ruling did the Supreme Court suggest that an MLA obligation to "promote oil and

natural gas development," Pet. Br. at 22, limits the Interior Department's authority

to protect the public interest when overseeing federal oil and gas resources,

*McLennan*, 283 U.S. at 419.

It is telling, moreover, that none of Petitioners' MLA citations postdate

1960. This is because amendments to the MLA adopted by Congress in 1987

---

[7] The conditions prompting the MLA's enactment are highly relevant today, as current U.S. federal onshore oil and gas production is at an all-time high. *See* Fed. Resp. Br. at 29. Further increases are unlikely to accomplish the MLA's core purpose of managing oil and gas to conserve public resources and protect the public interest.

expressly include environmental protection, bonding, and surface reclamation within BLM's mandate under the MLA. In 1987, Congress required that BLM "regulate all surface-disturbing activities conducted pursuant to any lease . . . and [] determine reclamation and other actions as required in the interest of conservation of surface resources." 30 U.S.C. § 226(g). Of particular relevance here, the 1987 amendments require that the agency:

> shall, by rule or regulation, establish such standards as may be necessary to *ensure that an adequate bond, surety, or other financial arrangement will be established prior to the commencement of surface-disturbing activities on any lease, to ensure the complete and timely reclamation of the lease tract, and the restoration of any lands or surface waters adversely affected by lease operations* after the abandonment or cessation of oil and gas operations on the lease.

*Id.* (emphasis added). Section 226(g) makes clear that the MLA imposes much broader and more balanced management obligations than Petitioners would have the Court believe—and that adequate bonding is an integral part of protecting the public interest. *See also* infra at 29-40. The Leasing Rule challenged in this case implements Section 226(g)'s direction, as well as BLM's obligations under FLPMA.

Further, when BLM does issue leases and approve drilling permits, nothing in the MLA suggests that its authority over lessees is circumscribed—even when such regulatory oversight will discourage development. Instead, 30 U.S.C. § 187 requires that all leases include provisions "necessary . . . for the protection of the

interests of the United States . . . and for the safeguarding of the public welfare."

Section 187 also requires BLM to ensure that companies "exercise . . . reasonable

diligence, skill, and care in the operation" of activities on federal leases. *Id*; *see*

*also* H.R. Rep. No. 66-398, at 12–13 (1919) (noting that the MLA gives Interior

the "right to prescribe rules and regulations against wasteful practices").

These statutory provisions reflect a Congressional intent to require that oil

and gas development be done responsibly and in a manner that protects the public

interest, not that the Interior Department promote relentlessly expanded oil and gas

production with no consideration for public lands or the American public. BLM

explained this in its response to comments preceding the Final Rule:

> With respect to contentions that the BLM's proposed regulations
> exceed the Secretary's authority to select lands for leasing, the MLA,
> 30 U.S.C. 226(a), by providing that the Secretary ''may'' lease lands,
> necessarily provides the BLM with broad discretion in determining
> precisely which lands and parcels the BLM will offer at an oil and gas
> lease sale. Accordingly, the agency has, since at least 1988, *consistently
> applied a public interest determination to any such decisions*. *See* 53
> FR 22828 (June 17, 1988) ('It is Bureau policy prior to offering the
> lands to determine whether leasing will be in the public interest.'). The
> MLA does not specify how and when this decision is to be made, and
> both the Supreme Court and the U.S. Court of Appeals for the Tenth
> Circuit have recognized the Secretary's discretion in this sphere.

LRR_0075112 (emphasis added) (*Citing Udall v. Tallman,* 380 U.S. at 4; *W.*

*Energy All. v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013)). *See also Haley v.*

*Seaton*, 281 F.2d 620, 625 (D.C. Cir. 1960) (use of word "may" gives Secretary

discretion not to lease); *Duesing v. Udall*, 350 F.2d 748, 751–52 (D.C. Cir. 1965)

(rejecting argument that agency lacked authority to decline leasing for the sake of environmental protection); *W. Energy All. v. Biden,* No. 21-CV-13-SWS, 2022 WL 18587039 at *10 (D. Wyo. Sept. 2, 2022) (citing 30 U.S.C. § 226(a)) ("the DOI Secretary enjoys wide discretion when it comes to determining which federal lands will be offered for oil and gas development.").[8]

In a December 31, 2024 decision in this District, Judge Skavdahl affirmed that use of the term "may" in 30 U.S.C. § 226(a) "creates a presumption of discretion under normal rules of statutory interpretation," and agreed with the Tenth Circuit that § 226(a) "continues to vest the Secretary with considerable discretion to determine which lands will be leased." *Wyoming v. Dep't of Interior*, 22-cv-747-CVS (lead case) 2024 WL 5264647 at *12 (D. Wyo. Dec. 31, 2024) (internal citations omitted). This new decision confirms that under well-established precedent, the Leasing Rule represents a valid exercise of BLM's authority under the MLA.[9]

---

[8] As Federal Respondents explain, the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369 (2024), "offers no reason to depart" from these court decisions and other established law. *See* Fed. Resp. Br. at 25-26. *See also infra*, n.9 (discussing recent application of *Loper Bright* in this District)

[9] The court applied *Loper Bright*, 603 U.S. 369, and "constru[ed] the phrase 'where eligible lands are available' without deference to the agency's interpretation," but nonetheless agreed with BLM's interpretation of those terms, and still found that BLM did not violate the MLA, act arbitrarily and capriciously, or abuse its discretion in abstaining from holding the quarterly Wyoming lease sales at issue. *Wyoming v. Department of Interior*, 2024 WL 5264647. at *12-13.

In short, the MLA's core purpose is that BLM manage the federal mineral estate to *protect the public welfare and interests of the United States* – not the interest of oil and gas companies. The MLA gives BLM ample flexibility to protect the public welfare and national interests, even if doing so requires limiting the amount of oil and gas development occurring. Petitioners' characterization of the MLA is misleading at best, and incorrect at worst.

## B. FLPMA Requires BLM to Consider the Public Interest—Not "Promote" Oil and Gas Extraction

Petitioners' FLPMA arguments are equally unavailing. As with the MLA, Petitioners fabricate a conflict between the Leasing Rule and FLPMA's mandates using inaccurate characterizations of FLPMA's directives and purpose.

First, Petitioners wrongly claim that "because FLPMA prohibits only unnecessary or undue degradation, not *all* degradation, BLM must ensure that regulatory measures do not prevent the extraction of federal minerals." Pet. Br. at 18 (citing *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 78 (D.C. Cir. 2011) (internal quotations omitted)). As with Petitioners' MLA arguments, the court should reject the suggestion that every regulation or requirement that in any way restricts federal mineral extraction contravenes FLPMA. Even the sole case on which Petitioners rely — *Theodore Roosevelt Conservation P'ship v. Salazar*—fails to support their strained construction of FLPMA. 661 F.3d. at 78.

In that case, the court found that BLM's proposed mitigation measures "would be adequate to prevent degradation that is unnecessary to, or undue in proportion to," the natural gas development allowed in the area. *Id.* at 77-78. Accordingly, the court held that BLM did not act arbitrarily and capriciously in determining that its plan would prevent unnecessary or undue degradation to sage grouse habitat. *Id.* In other words, BLM *was not required to adopt Plaintiffs'* proposed setbacks, which would have limited oil and gas development further than BLM's mitigation measures did. But that case does not stand for Petitioners' assertion that FLPMA *requires BLM* to *promote* oil and gas extraction—much less their suggestion that *any* rule or regulatory measure that might limit mineral leasing or development in some yet-unknown location or circumstance violates FLPMA.

Indeed, in this Circuit, courts have found "it is past doubt that [FLPMA's] principle of multiple use does not require BLM to prioritize development over other uses." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 710 (10th Cir. 2009). *See also* Fed. Resp. Br. at 28-29. Pursuant to FLPMA's multiple use mandate, BLM holds equal obligations to manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric*,* water resource, and archaeological values." 43 U.S.C. § 1701(a)(7), (8). *See also Norton,* 542 U.S. at 58.

Congress gave BLM ample authority, discretion—and indeed, responsibility— to balance those obligations in service of the public interest—even *if* doing so constrains oil and gas development in a particular instance. *See, e.g.*, *New Mexico ex rel. Richardson,* 565 F.3d at 710 (*citing Rocky Mtn. Oil & Gas Ass'n v. Watt,* 696 F.2d 734, 738 n. 4 (10th Cir.1982)). Moreover, the Leasing Rule does *not,* as Petitioners suggest, categorically or permanently "prevent" federal mineral extraction. Indeed, as BLM states in response to comments on the Final Rule, even if, in applying certain provisions of the Rule, the agency did "decide to defer including particular lands from any particular lease sale, nothing in this rule prevents those lands from being offered in future sales." LRR_0075112.

Petitioners also argue that the Leasing Rule fails to take into account "the long-term needs of future generations for renewable and non-renewable resources," in violation of FLPMA. Pet. Br. at 19 (quoting 43 U.S.C. § 1702(c)). While Petitioners fail even to explain this argument—let alone support it—their brief implies that the only way BLM can "take into account the long-term needs of future generations" is to allow perpetual, unbridled oil and gas leasing and development on federal public lands.[10] This interpretation is particularly dubious in

---

[10] *See* Pet. Br. at 18 (quoting FLPMA at 43 U.S.C. § 1702(c), and § 1732(a) and (b) in asserting that "accounting for the productivity of the federal mineral estate is a statutory imperative" under FLPMA and that BLM's regulatory measures must "not prevent the extraction of federal minerals."). This narrow construction of

light of the well-documented adverse environmental and health impacts of

unmitigated oil and gas development (particularly orphaned and idle wells, *see*

*supra* at 11; *infra* at 36, 38-39), and the clear scientific imperative that oil and gas

production must cease to avoid the worst impacts of the climate crisis. *See*

LRR_0070715-17; LRR_0070720-22; LRR_0054341; LRR_0058168-213;

LRR_0050632-35.

Indeed, the long-term needs of future generations must be understood

relative to the agency's ultimate imperative: to provide for the "harmonious and

coordinated management of the various resources without permanent impairment

of the productivity of the land and the quality of the environment, with

consideration being given to the relative values of the resources and not necessarily

to the combination of uses that will give the greatest economic return or the

greatest unit output." 43 U.S.C. § 1702(c). In that light, the Rule, specifically the

updated bonding requirements to prevent orphan wells and ensure timely and

---

FLPMA is inconsistent with both the record and established law. For one, Petitioners ignore the reality that oil and gas are *non-renewable resources* that, by definition, cannot be extracted indefinitely. *See Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 877 (9th Cir. 2017) (stating "minerals are not renewable resources," in the context of the National Forest Management Act, and in the context of FLPMA's mineral leasing provisions). Indeed, approximately 23.7 million acres of federal public lands in the U.S. are already leased for onshore oil and gas development, with over 89,000 wells capable of production. LRR_0053167. And Federal onshore oil production is at an all-time high. *See supra* at 18, Note 7, citing Fed. Resp. Br. at 29.

complete reclamation—and thus, avoid permanent impairment— are essential to fulfilling BLM's FLPMA (*and* MLA) mandates. This is true even *if* the reforms might discourage production for some operators on some federal lands, an outcome which is speculative at best.[11]

These forward-looking, public interest-oriented statutory imperatives are also reflected in FLPMA's "sustained yield" requirement, which obliges BLM to satisfy the multiple use mandate "in perpetuity." *See* 43 U.S.C. § 1702(h). As the Interior Solicitor has explained:

> "The term [sustained yield] cautions against managing public lands for the short-term expediencies of the day, and, as the Supreme Court has explained, 'requires the BLM to control depleting uses over time, so as to ensure a high level of valuable uses in the future.' [citing *Norton*, 542 U.S. at 58]. Because the term 'sustained yield' expressly incorporates principles of 'multiple use,' its reference to perpetually maintained 'output' accounts for impacts to both developable resources, such as timber for harvest, and environmental resources, such as watersheds and wildlife. Principles of sustained yield, like principles of multiple use, do not elevate certain uses over others, but rather, delegate discretion to the BLM to manage public lands in the best interests of the American people today, tomorrow and into the future."

---

[11] *See* LRR_0074623, 25-26 (and Table 15) (BLM explaining, in Regulatory Impact Analysis for the Rule, that "the amount of money operators will save by switching to non-Federal leases will be very small" and "[t]herefore, it is not anticipated that bonding costs will significantly influence an operators' [sic] decision to change from leasing on Federal to non-Federal lands."); *See also* LRR_0074582 ("change in annual bonding costs will represent approximately 1% of the value of average production per lease"); LRR_0075113 (citing LRR_0023332-49) (BLM stating it does not believe that increased royalty and bonding rates will shift production away from federal lands, but "instead will bring the rates more in line with one another across jurisdictions").

LRR_0070742, n.82. (citing Solicitor's Opinion M-37039 at 8-9). Petitioners'
myopic view of FLPMA would do just the opposite, robbing BLM of the
Congressionally-delegated discretion necessary to carry out its statutory duties to
protect the public interest—and effectively giving private industry carte blanche to
extract oil and gas for "short-term expediencies," without regard for "sustained
yield" and long-term impacts to both "developable" and "environmental"
resources. *Id*.

Similarly, FLPMA directs BLM to manage public lands and resources "to
meet the present and future needs of the American People" while "conform[ing] to
changing needs and conditions." 43 U.S.C. § 1702(c). This is precisely what the
agency has done in promulgating the Leasing Rule in response to reforms in
recently enacted statutes, the GAO and OIG reports highlighting serious
deficiencies in the existing rules, and an emerging orphan and idle well crisis. *See
infra*, Section II.

## C. BLM had Discretion to Regulate More Aggressively to Protect the Public Welfare

In addition to misreading the core directives of the MLA and FLPMA,
Petitioners mischaracterize the Leasing Rule as an "inappropriate attempt to further
expand [BLM's] subjective discretion for which lands to lease." Pet. Br. at 20. To
the contrary, by framing the Leasing Rule narrowly and confining its objective

requirements primarily to fiscal reforms, BLM has in fact exercised its discretion much *less* expansively than it could have.

As Conservation Groups emphasized in comments on the Proposed Rule, the Rule's relatively circumscribed scope represents a missed opportunity for BLM to exercise the full sweep of its broad discretion under the MLA and FLPMA—and its "plenary" and "capacious" constitutionally-derived authority[12]—to align the federal oil and gas program with science-based climate guardrails, and ensure that federal public lands are a source of enduring ecological and human health protections and resilience, not degradation and pollution. *See supra* at 13-14.

For example, BLM could take environmental justice and the potential for disproportionate, adverse, and cumulative human health impacts into account when determining which lands to make available for lease. *See, e.g.,* LRR_ 0054516-20; LRR_0070757-66. Or, BLM could have structured the Rule to allow for a phase-out of federal fossil fuel development, consistent with emissions reductions curves necessary to maintain a reasonable chance of averting the worst consequences of climate change — and concomitant impacts on the public lands BLM is tasked to manage and protect. *See, e.g.,* LRR 0070723-25; LRR_0058168-213;

---

[12] *See supra* at 5-9 (discussing authority conferred by the U.S. Constitution's Property Clause, and BLM's ample authority and discretion in managing public lands and resources for the public interest under the MLA and FLPMA, which squarely allows the agency to place limits and conditions on both leasing and production of oil and gas).

LRR_0054341; LRR_0054516-20; LRR_0050632-35. BLM also could have adopted full-cost, per-well bonding, eliminated *all* forms of blanket bonds, and implemented additional bonding reforms to better ensure adequate funds for complete and timely reclamation, and prevent additional orphaned and idle wells from causing unnecessary or undue degradation to federal public lands. *See infra* at 39-40.

BLM largely declined to seize these opportunities in promulgating the final Leasing Rule. *See* LRR_0075110-13 (BLM's responses to applicable comments). Indeed, far from being an "inappropriate attempt to expand BLM's discretion," the Leasing Rule is a lawful, if anemic, exercise of BLM's ample authority and discretion in managing public lands to serve the public interest. Petitioners' contortions of the MLA, FLPMA, and the record to suggest otherwise are unavailing.

## II.    THE LEASING RULE'S BONDING REFORMS ARE NOT ARBITRARY OR CAPRICIOUS

Petitioners argue that the increased bonding amounts in the Leasing Rule are arbitrary and capricious in violation of the APA, because they target a problem that "largely does not exist," disregard impacts to "small businesses," and incorporate

inaccurate assumptions into their estimated costs to operators.[13] All of these

assertions are false. The increased minimum bonding amounts are reasonable—

albeit still insufficient to guarantee full coverage of reclamation costs—and

supported by ample record evidence and explanation.[14]

The bonding reforms in the Leasing Rule are necessary to address orphaned

and idle wells and their associated adverse impacts—and prevent thousands of idle

wells from becoming orphaned or otherwise abandoned without adequate

reclamation, at the public's expense. They represent a small but critical step

---

[13] *See* Pet. Br. at 25-39. Petitioners' arguments regarding impacts to small business and estimated costs to operators are thoroughly addressed in Federal Respondents' Brief. *See* Fed. Resp. Br. at 33-38. Intervenor Respondents emphasize in particular Federal Respondents' argument that BLM has no legal obligation to "justify" the economic costs of bonds to operators. *Id.* at 36-37 (citing 30 U.S.C. § 226(g)). Indeed, the MLA's requirement to ensure adequate bonds for timely and complete reclamation creates no exceptions based on the costs of those bonds. *Id.* However, as discussed throughout this brief, BLM *does* have firm legal obligations to protect taxpayers and public lands.

[14] *See, e.g.,* LRR_0075127-33; LRR_0053182-85; LRR_0053166-68; LRR_0074629 (BLM explaining that, per GAO's 2019 report, only 16% of newly-identified orphaned BLM wells had bonding sufficient to cover remaining reclamation costs, and that "[a]ssuming the actual range of plugging and reclamation costs of orphaned wells is evenly distributed across the estimated range of $112,500 to $180,000, the minimum value for individual bonds ($150,000) will fully cover plugging and reclamation costs for over one-half (56%) of orphaned wells and total annual unfunded costs of plugging and reclaiming orphaned wells will be reduced by between $1.3 million and $3.8 million per year."); LRR_0050547 (discussing need for increased BLM bonds and insufficiency of previous bonding minimums to cover reclamation costs, as identified by 2011 and 2019 GAO reports and BLM's 2015 ANOPR); *See also infra* n.17.

towards reversing economic inequity and environmental and health harms that

decades of inadequate bonding have perpetrated on the U.S. government,

taxpayers, and all who live, work, or recreate on or near federal public lands.

Accordingly, the bonding increases are also essential to BLM's ability to meet its

statutory obligations and responsibilities to protect the public interest, now and for

future generations, under the MLA and FLPMA.

### A. The Bonding Increases in the Leasing Rule Are Necessary for BLM to Fulfill its Statutory Obligations and Protect the Public Interest

Without the bonding increases in the Leasing Rule, BLM cannot fulfill its

core directives under the MLA and FLPMA to manage public lands and resources

in service of the public interest. Federal Respondents describe the MLA's

requirement to ensure adequate bonding for complete and timely reclamation as the

"core motivation for BLM's bonding increases." Fed. Resp. Br. at 30, citing 30

U.S.C. § 226(g). As BLM has clearly explained—and the record demonstrates—

outdated bonding minimums have rendered BLM unable to meet this statutory

mandate, necessitating the reforms in this Rule. *See* Fed. Resp. Br. at 30-33.

The Rule's bonding increases are also essential to compliance with

FLPMA's requirement that BLM "by regulation or otherwise, take any action

necessary to *prevent* unnecessary or undue degradation" of federal public lands. 43

U.S.C. § 1732(b) (emphasis added). To accomplish this, BLM must take a

prophylactic, proactive approach to orphaned and idle wells and their associated

adverse impacts—including air and water pollution, and emission of methane, a potent greenhouse gas.[15] Even by Petitioners' definition, these effects represent degradation that is unnecessary or undue. According to Petitioners, "[t]he Interior Board of Land Appeals has interpreted "unnecessary or undue degradation" to mean the occurrence of "'something more than the usual effects anticipated' from *appropriately mitigated development.*" Pet. Br. at 18-19 (internal cites omitted, emphasis added). Underbonded, unreclaimed wells — whether formally "orphaned" or not—represent the antithesis of "appropriately mitigated development." They are entirely unnecessary to oil and gas extraction. Their adverse effects —and indeed, their very existence—are the direct result of operators shifting their legally established cleanup responsibilities to the public. *See, e.g.,* LRR_0004418; LRR_0004915.

Bonding increases in the Leasing Rule will cover plugging and reclamation costs for more orphaned wells and allow BLM to begin plugging and reclaiming these wells eight months sooner, on average. LRR_0074581. As BLM states, this expedited timing "could provide benefits related to wildlife, vegetation, soil erosion, climate change (reduced greenhouse gas emissions from unplugged orphaned wells), visual and aesthetic resources, ground water, and allowing the

---

[15] *See supra* at 9, 11 *infra* at 39; *See also* LRR_0050519-20 (citing research estimating that orphaned and idle wells could be responsible for up to 10% of methane emissions from the oil and gas sector).

surface land to be utilized for other uses sooner." *Id.* Moreover, as Conservation

Groups have explained, adequate bonding to ensure reclamation and prevent

orphaned and idle wells:

> is *particularly* important for industries like oil and gas extraction that are
> inherently subject to boom and bust cycles. Subject to fluctuations in
> international commodity prices, the oil and gas industry is prone to a pattern
> of drilling lots of new wells when prices are high, and then experiencing
> bankruptcies, idlings, and abandonments when prices drop.

LRR_0070747, citing LRR_0004918 (2019 GAO Report) (emphasis in

original); LRR_0054329-30, 35-36. Conservation Groups have offered

examples illustrating this dynamic. *See, e.g.,* LRR_0050548-49;

LRR0054329-30. Effective bonding also frees regulators to take appropriate

enforcement actions against operators without fear that such actions will

lead to *additional* well abandonments with unfunded clean-up obligations.

LRR_0070747; LRR_0054330-32.

Finally, BLM's bonding increases and other reforms in the Leasing

Rule represent precisely the type of regulatory measures that

> may be particularly necessary for those public lands with a historical
> legacy of degradation, the result of past uses that have left enduring
> impacts that impair certain resource values. This legacy includes lands
> where past use occurred before current federal regulations came into
> force or where *the land user may have adhered to the standards and
> practices that prevailed at the time, but which we now understand, with
> the benefit of greater experience and scientific insight, to have been
> destructive to one or more resource values.*

Solicitor's Opinion M-37039 at 9. (emphasis added). Oil and gas extraction has degraded public lands for over a century, leaving behind increasing numbers of harmful, orphaned and idle wells. Now, with the benefit of greater experience and insight, it is clear that outdated, anemic bonding has contributed to this problem and been destructive to other resource values.[16] Accordingly, BLM has implemented bonding increases in the Leasing Rule—as it *must* do to comply with FLPMA and the MLA (along with the IRA and IIJA). Petitioners offer no compelling record evidence or legal authority to suggest that these bonding increases are instead arbitrary. Indeed, their dissatisfaction with the bonding increases appears to stem more from their sense of grievance at a modest change from BLM's pro-industry regulatory approach that has prevailed for decades than with any meaningful legal deficiencies in the Rule.

## B. The Record Supports BLM's Decision to Raise Minimum Bonding Amounts in the Leasing Rule

The record is replete with evidence that the Leasing Rule's bonding reforms are necessary and long overdue.[17] And BLM offers thorough, reasoned

---

[16] *See supra* at 9-11 (discussing the need for bonding reforms). *See also supra* at 25-27 (discussing BLM's FLPMA obligations to avoid permanent impairment and adapt to changing needs and conditions—which include the need to address both the climate crisis and orphaned and idle wells).

[17] *See, e.g.,* LRR_0004415-46 (OIG report on BLM's idle well program); LRR_0004449-97 (GAO report, "BLM Needs to Improve Its Data and Oversight of Its Potential Liabilities"); LRR_0004914-51 (GAO report, "BLM Should

explanations of how that evidence, along with its statutory directives, informed its

decisions to increase minimum oil and gas bond amounts. *See, e.g.,*

LRR_0075127-33 (explanations in Final Rule); LRR_0053166-68 (explaining

need for bonding reform, and scope of orphan and idle well risks and impacts in

the Proposed Rule); LR_0053184 (determining the average cost of well plugging

and surface reclamation to be $71,000.00, with a range of $35,000 to $200,000,

and explaining that it rendered prior minimum lease and statewide bonds

inadequate to plug even one well); *See also* Fed. Resp. Br. at 27-28, 30-33.

　　　　Faced with BLM's clear articulation of a "rational connection between the

facts found and the choices made," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)—and a rule provision that asks

industry to pay an amount *approaching* its fair share of reclamation costs for the

---

Address Risks From Insufficient Bonds to Reclaim Wells"); LRR_0004952-77
(GAO report, "Challenges to Ensuring a Fair Return for Federal Energy
Resources); Conservation Groups' comments on bonding reforms in the Proposed
Rule (including comments by WELC et al., LRR_0070746-57; and WORC et al.
LRR_0054327-42); LRR_0050545-54 (WORC, Taxpayers for Common Sense,
and Natural Resources Defense Council Petition to Interior and BLM for
rulemaking to modernize the onshore oil and gas program's financial assurance
requirements); LRR_0050555-57 (WORC bonding reform fact sheet);
LRR_0050516-41 (WORC, "Reclaiming Oil and Gas Wells and Addressing
Climate Impacts: State Policy Recommendations"); LRR_0050542-44 (Colorado
example of zombie wells on federal lands); LRR_0023340-41 (Interior
Department's 2021 Report on the Federal Oil and Gas Leasing Program,
identifying need for increased bonding, and inadequacy of existing regulatory
scheme).

first time in decades—Petitioners attempt to manufacture a violation of the APA by minimizing the scope and severity of the problems animating the bonding increases. Petitioners' repetition and misinterpretation of a tired, inaccurate statistic that there are only 37 federal orphan wells (Pet. Br. at 28), ignores not only the true count of designated "orphaned" wells, but also the thousands, perhaps tens of thousands, of unplugged wells that are effectively "orphaned" in all but name — and inflict identical environmental, health, and economic risks and impacts on the public as those that have been formally designated.[18] Petitioners also ignore a broader underlying problem that necessitates a preventative approach through regulation—thousands of under-bonded *idle* wells at heightened risk of falling into disrepair, polluting public lands, and becoming orphaned at taxpayers' expense.[19]

Contrary to Petitioners' assertions, the record shows that there are in fact nearly 300 documented "orphaned" wells[20] across federal lands—and counting.

---

[18] *See, e.g.,* LRR_0050548, reporting over 8,000 wells that are orphaned, or idle and at risk of becoming orphaned, in 5 intermountain western states alone; *See also* LRR_0050520, citing EPA use of term "abandoned well" to encompass wells with no recent production and not plugged or with no known owner, and plugged wells that emit methane and carbon dioxide—and EPA's estimate that there are 3.2 million of these wells in the U.S. While not all of these wells are on federal land, the record shows that far more than 37 undoubtedly are.

[19] *See infra* at 38-39; *See also* Fed. Resp. Br. at 5-7, 12, 32-33.

[20] *See* LRR_0021253-54 (BLM's IM 2021-039, defining orphan wells as a well with 1) no legally responsible or liable party to perform permanent well plugging, abandonment and reclamation, and 2) no adequate financial assurance (*i.e.* bond(s)) for which the United States is the beneficiary to cover the estimated cost for permanent well plugging, abandonment, and surface reclamation).

*See* Fed. Resp. Br. at 32 (citing LRR_0004931). Moreover, there are likely many hundreds, if not thousands, more that meet the definition of "orphaned" but have simply gone undetected because federal agencies lack capacity for comprehensive monitoring and documentation. *See* LRR_0004931; LRR_0050556 (stating that, as of 2022, "there are more than 2.6 million unplugged onshore wells in the United States. It is estimated that it would cost $280 billion to plug those wells. This *does not include* the estimated 1.2 million wells that are undocumented").[21]

Indeed, the absurdly low orphan well statistic that Petitioners tout to support their arguments for the "efficacy" of existing regulatory tools almost certainly highlights the opposite conclusion. The record shows that BLM's existing tools—including the case-by-case bonding adequacy reviews Petitioners prefer over more broadly-applicable bonding minimums—are wildly inadequate to prevent and reclaim orphan wells. *See, e.g.,* LRR_0054332; LRR_0070750-52; LRR_0050547-49; LRR_0003385-92; LRR_0004935-36, 40-41.[22]

As Conservation Group WORC noted in comments on the Proposed Rule, "swift and efficient implementation is key to the success of the bond adjustment

---

[21] Citing https://carbontracker.org/reports/billion-dollar-orphans/)

[22] As early as 2011, GAO identified that over 2/3 of BLM field offices surveyed failed to conduct complete or consistent bonding adequacy reviews, and cited lack of staff resources as a barrier. LRR_0003385-88. And in 2019, the GAO found that BLM failed to secure about 84% of the proposed bonding increases following case-by-case bonding adequacy reviews in the years analyzed. LRR_0004935-36.

process, and unfortunately in practice this has not been the case." LRR_0054332.

In fact, WORC attached to its comments a spreadsheet detailing bond adjustments

from 2010-2021 and showing that "bond adjustments can take years to process and

in some cases the agency does not obtain the requested amount." *Id*. As

Conservation Groups emphasized, "taken together, GAO findings confirm that

BLM cannot continue to rely on a system based on setting minimum bond amounts

and then rely on the conceit that it will make periodic adjustments, which 'for the

majority of instances,' does not happen." LRR_0070752.

The Rule's bonding increases are designed not only to address existing

orphan wells, but also to prevent thousands of *idle* wells from *becoming* orphaned–

–and costing taxpayers millions of dollars. *See* Fed. Resp. Br. at 5-7, 12, 32-33.

These idle well risks are well-documented in the record, and thoroughly explained

by BLM in its rationale for promulgating the Leasing Rule—yet Petitioners ignore

them. Moreover, many idle wells are *already* causing unmitigated environmental

and health risks and impacts after years, even decades, of neglect. *See, e.g.*,

LRR_0050547 (Citing LRR_0003403, GAO findings that 5,100 federal wells had

been idled for seven years or more, and over 2,000 of these had been idle for 25

years or more). BLM officials have told GAO that these thousands of "long-term

idle wells" on federal public lands pose the "greatest risk for causing

environmental degradation." LRR_0003403. Far from a "problem that largely does

not exist," idle wells are instead an "important aspect of the problem" that BLM was *required* to consider and address in promulgating the Leasing Rule and its bonding increases. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm,* 463 U.S. 29 at 43. *See also* Fed. Resp. Br. at 5-7, 12 (discussing statutory directives to address idle wells).

Whether formally designated as "idle" or "orphaned," or otherwise unplugged and unreclaimed, all of these wells pose significant risks to taxpayers, and are ongoing sources of harmful pollution that degrade public lands and cause serious health and safety risks to nearby people and wildlife. *See* LRR_0050519-20; LRR_0070747; LRR_0050549-50. Documented threats to human health and the environment posed by unplugged wells include air pollution, soil and well water contamination, surface and groundwater contamination, emissions of potent greenhouse gases, and explosions from migration of gas into buildings and residences. LRR_0070747. Abandoned wells can leak volatile organic compounds ("VOCs") such as carcinogenic benzene, toluene, and hexane, and dangerous methane gas. *Id.*[23]

As Conservation Groups and other commenters on the Proposed Rule have repeatedly emphasized, only a full-cost, per-well bonding approach can effectively

---

[23] Citing U.S. EPA's Integrated Risk Information System, "Benzene," https://iris.epa.gov/static/pdfs/0276_summary.pdf.

prevent orphaned, idle, and unplugged wells and their adverse impacts and ensure that all wells can be remediated by the *operator*—or if the operator fails to do so, that sufficient funds are available to BLM to complete remediation without burdening the public. LRR_0054329-30; LRR_0070751. Indeed, in 2022, a number of groups petitioned BLM and the Interior Department to adopt full-cost, per-well bonding through rulemaking—and cited substantial data and resources in support of that ask. *See* LRR_0050545-54.

Given this ample record support indicating that orphaned, idle, and otherwise unplugged and unreclaimed wells are likely an even bigger problem than BLM estimates—and that full-cost, per-well bonds are warranted to address this problem—the Rule's bonding minimums (based on average reclamation costs, *not* guaranteed full cost) are not the outsize, arbitrary reaction to a nonexistent problem that Petitioners decry. They are in fact an insufficient but nonetheless necessary initial step towards aligning BLM's bonding requirements with its statutory requirements, and better equipping the agency to meet the economic and environmental challenges of today *and* tomorrow.

## CONCLUSION

The Court should uphold the Leasing Rule, and deny Petitioners' requests for relief.

Respectfully submitted this 6th day of January, 2025,

/s/ Shannon Anderson
Shannon Anderson (Wyo. Bar No. 6-4402)
414 Gladstone St.
Sheridan, WY 82801
(307)763-0995
sranderson720@gmail.com

/s/ Allyson Beasley
Allyson Beasley (NM Bar No. 152658)
(*pro hac vice*)
WESTERN ENVIRONMENTAL LAW CENTER
409 E. Palace Ave #2
Santa Fe, NM 87501
(505)570-5565
beasley@westernlaw.org

/s/ Melissa Hornbein
Melissa Hornbein (MT Bar No. 9694)
(*pro hac vice*)
WESTERN ENVIRONMENTAL LAW CENTER
103 Reeder's Alley
Helena, MT 59601
(406)708-3058
hornbein@westernlaw.org

/s/ Morgan O'Grady
Morgan O'Grady (NM Bar No. 159184)
(*pro hac vice*)
WESTERN ENVIRONMENTAL LAW CENTER
409 E. Palace Ave #2
Santa Fe, NM 87501
(505)570-5566
ogrady@westernlaw.org

*Counsel for Intervenor-Respondents*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32 (a)(7)(B), I certify that this brief complies with the type-volume limitation set by Rule 32(a)(7)(B)(i), because it contains 9597 words, excluding the parts of the brief exempted by Rule 32 (f).

/s/ *Allyson A. Beasley*
Allyson A. Beasley
Counsel for
Intervenor-
Respondents